**A & G CONSTRUCTION CO., INC.,**
Appellant,

v.

**REID BROTHERS LOGGING CO., INC.,**
Appellee.

**REID BROTHERS LOGGING CO., INC.,**
Cross-Appellant,

v.

**A & G CONSTRUCTION CO., INC.,**
Cross-Appellee.

Nos. 2360, 2388.

Supreme Court of Alaska.

March 1, 1976.

Clifford H. Smith, of Ziegler, Ziegler & Cloudy, Ketchikan, for appellant and cross-appellee.

A. Fred Miller, Ketchikan, for appellee and cross-appellant.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

## OPINION

BOOCHEVER, Chief Justice.

These appeals concern disputes as to the amounts due for materials furnished for use on a highway construction project. Our resolution of the issues involves application of provisions of the Uniform Commercial Code (U.C.C.) to the contract in dispute.

On August 10, 1971, A & G Construction Co., Inc. ("A & G") and Reid Brothers Logging Co., Inc. ("Reid") entered into a materials supplier agreement wherein Reid agreed to supply A & G with sand; crushed aggregate base course, grading D1 ("D1"); and hot bituminous pavement aggregate ("hot rock"). The material was to be used in a state highway construction project in the Petersburg area for which A & G was the general contractor. Payment for the materials was to be on the basis of "State accepted scale ticketed tonnage at the price of $2.65 per ton". The payments to Reid were to be made within ten days of the state's payment to A & G. The original agreement, however, did not specify the amount of material or the time of delivery.

Shortly after the agreement was executed, A & G sent Reid a purchase order for 59,466 tons of D1, 21,780 tons of hot rock, and 2,500 tons of sand. Reid was to deliver the material to a stockpile in Scow Bay, outside of Petersburg. The D1 and sand were weighed by the state at the stockpile and placed directly on the road. The hot rock, however, was taken by A & G from the stockpile to its mixing plant where it was mixed with oil to make asphalt. During this process, quantities of hot rock were wasted or lost. The finished asphalt was then taken to the road where it was weighed by the state before being placed on the road.

During the course of performance, the agreement was modified in three respects. In the late spring of 1972, A & G and Reid agreed to raise the price of the hot rock to $2.95 per ton. Toward the end of the project, it became necessary for A & G to procure more D1 than was supplied under the original purchase order. At Reid's request, the parties agreed to increase the price of the additional D1 by $1.00 per ton to $3.65. Furthermore, since the highway construction project ran into time difficulties, A & G agreed to pay half of the overtime costs if Reid would work 24 hours a day to supply the additional D1.

Reid brought suit against A & G claiming it had not been paid the amount due under the written contract and additional agreements. The trial court's findings and

awards, which are contested by A & G on this appeal, are:

First, the agreement should be construed to read that A & G was to pay Reid for all material delivered to Scow Bay, so that Reid was entitled to payment for 6,067.55 tons of hot rock "lost" between the stockpile and the road. Reid was awarded $17,899.27 for this material.

Second, A & G was late in its payments to Reid, so that Reid was awarded $3,625.75 as interest on those payments and $173.67 interest on short-term loans taken by Reid because of the late payments.

Third, the original contract was not a requirements contract, i. e. a contract to supply A & G all of the quantities required for completion of the contract with the state, and a new agreement for valid consideration had been made whereby A & G owed Reid $5,888.00 for the additional D1 supplied.

Fourth, the original agreement concerning the hot rock had been modified, and A & G owed $5,094.73 for an additional $.30 per ton for 19,682.5 tons of hot rock.

Reid appeals from the decision of the trial court that Reid did not meet its burden of proof as to 800 tons of rejected D1 that it contended A & G had appropriated.

I

A & G contends that the trial court erred in awarding $17,899.27 for the loss of 6,067.55 tons of "hot rock" delivered by Reid to A & G. The trial court based this award on the finding that, sometime between the delivery of the hot rock to the stockpile at Scow Bay and the time that it was placed on the road, there was a loss or "waste" of 6,067.55 tons.

The dispute is whether A & G was liable for the amount of hot rock that Reid delivered to the stockpile or whether A & G was liable only for that amount of hot rock actually put on the road. A & G contends that the contract language "[p]ayment for the materials will be on the basis of State accepted scale ticketed tonnage, at the price of $2.65 per ton" is unambiguous in meaning that A & G would only be liable for the amount of hot rock that was actually put on the road, weighed and paid for by the state.

 The U.C.C. [AS 45.05.002 et seq.] provides a comprehensive scheme of obligations and rights of the parties to an agreement.[1] These obligations and rights apply to any contract for the sale of goods unless the parties otherwise agree.[2]

---

1. Since this transaction concerns the sale of goods AS 45.05.044 [U.C.C. § 2–105], the provisions of the U.C.C. are applicable. AS 45.05.038 [U.C.C. § 2–102] *See also Prince v. LeVan*, 486 P.2d 959, 962 (Alaska 1971). Even though the application of the U.C.C. was not argued by the parties or considered by the trial court, this court may apply it in reaching a decision. In affirming portions of the trial court's decision, we are not bound by the particular legal grounds for the decision. *See*, for example, *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961); *Howarth v. Pfeifer*, 423 P.2d 680, 685 (Alaska 1967) (dissenting opinion by Justice Rabinowitz); and *Fireman's Fund American Ins. Cos. v. Gomes*, 544 P.2d 1013, opn. No. 1230, n. 12 (Alaska 1976).

2. AS 45.05.044 [U.C.C. § 2–105]; AS 45.05.038 [U.C.C. § 2–102]; AS 45.05.020(3)(11) [U.C.C. § 1–201(3)(11)]; AS 45.05.004(c) [U.C.C. § 1–102(3)]; *see also* R. Summers and J. White, Uniform Commercial Code, 22 (1972); and *Prince v. LeVan, supra*. Some sections of the U.C.C. cannot be varied even when the parties attempt to agree otherwise. *See* AS 45.05.004(c) [U.C.C. § 1–102(3)].

Under the Code, once the seller has tendered delivery, the buyer is under a duty to accept the goods unless the goods or the tender of delivery are nonconforming. AS 45.05.144(a) [U.C.C. § 2–507(1)]; AS 45.05.162 [U.C.C. § 2–601]. Furthermore, "[t]he buyer must pay at the contract rate for any goods accepted". AS 45.05.174(a) [U.C.C. § 2–607(1)].

The contract in this case provides that the place of delivery was the stockpile at Scow Bay. The contract states that the agreement "*is for furnishing in the separate stockpiles* three classifications of crushed materials" (emphasis added). Furthermore, the agreement provides that once the materials were stockpiled, A & G had complete control over their disposition.

We must therefore look to the contract between A & G and Reid to determine if the parties agreed to some specific payment provision. The contract did make detailed provision for payment. Our problem is therefore to interpret the contract provisions.

■■ Although the U.C.C. does contain provisions dealing with the interpretation of an agreement, they are inapplicable under the circumstances presented in this appeal.[3] Therefore general principles of contract law will determine this issue.[4]

■■ *Day v. A & G Constr. Co., Inc.,* 528 P.2d 440, 443 (Alaska 1974), states the relevant law concerning the interpretation of a contract. The interpretation of words is a matter for the court,[5] while resolution of a dispute as to the surrounding circumstances is for the trier of facts. Questions pertaining to the meaning to be given to the words of the contract are to be considered in the same manner as questions of law. Consequently, this court, in interpreting the words of a contract, is not bound by the lower court's views, and the "clearly erroneous" standard used in reviewing a

---

Therefore, under the Code, if A & G accepted the hot rock after its delivery to Scow Bay, A & G was obligated to pay at the contract rate for those materials delivered.

A & G did not reject any of the 6,067 tons of hot rock in dispute here. Furthermore, by transporting the hot rock to A & G's mixing plant, A & G was acting in a manner inconsistent with the concept of Reid's ownership of the material. Therefore, A & G accepted the hot rock [AS 45.05.172(a); U.C.C. § 2–606(1)] and, under the U.C.C., would pay for that hot rock at the contract rate unless the terms of the Code were waived by agreement [AS 45.05.004(c); U.C.C. § 1–102(3)].

3. AS 45.05.052(1) [U.C.C. § 2–202(a)] states that whether or not the contract is definite, a court may always look to usage of trade, course of dealing, or course of performance to explain or supplement any provisions of an agreement. Since this was the first agreement between A & G and Reid, only usage of trade and course of performance could be applicable to the present situation.

"Usage of trade" is defined as

a practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of the usage are to be proved as facts. . . . AS 45.05.028(b) [U.C.C. § 1–205(2)]

The testimony presented as to the regular method of supplying "hot rock" was directly conflicting. While the court below made no specific finding of fact with regard to this issue, the other findings clearly inferred that the issue was resolved in favor of Reid.

"Course of performance" is treated in these terms:

If the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, a course of performance accepted or acquiesced in without objection is relevant to determine the meaning of the agreement. AS 45.05.064(a) [U.C.C. § 2–208(1)]

Here, however, it cannot be said that Reid Brothers acquiesced or consented to a course of performance whereby they were to be paid only for the amount of hot rock placed on the road. Reid consistently and repeatedly complained about the discrepancies between its calculations of the amounts to be paid and the actual payments. A & G, on the other hand, reassured Reid that "it would work out all right in the end when they finally got all their figures together".

AS 45.05.052(2) [U.C.C. § 2–202(b)] permits the introduction of parol evidence of consistent additional terms agreed to by parties to a contract unless the court finds the writing was intended as a complete and exclusive statement of the terms of this agreement. *See* our discussion in *Braund, Inc. v. White,* 486 P.2d 50, 55–56 (Alaska 1971). This subsection is inapplicable here because neither party claims that any additional agreement was made prior to or contemporaneously with the written contract.

4. AS 45.05.020(3)(11) [U.C.C. § 1–201(3)(11)]; AS 45.05.006 [U.C.C. § 1–103]. *See also Prince v. LeVan, supra* at 962.

5. *See* our recent opinion in *National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.,* 546 P.2d 579, Opn. No. 1239 (Alaska 1976), for a discussion of general standards of contract interpretation.

trial court's factual findings is inapplicable.[6]

We must first decide whether the contract is ambiguous as to payment.[7] A contract is ambiguous when it is reasonably subject to varying constructions, interpretations, or meanings.[8] In the contract under review, the agreement was clear and unambiguous as long as the materials were weighed by the state at the stockpile. This was the situation with regard to the D1 and sand.[9] But the agreement is ambiguous with regard to the hot rock.

The agreement states that "[p]ayment for the materials will be on the basis of State accepted scale ticketed tonnage". A & G argues that this phrase clearly implies that Reid was to be paid only for those amounts of material actually weighed by the state. But immediately following the sentence quoted above, the agreement provided:

A firm stockpile payment price has not been established with the Highway Department at this time, but tentative stockpile payment will be at 75% of the unit price. Payment is to be made within ten days of payment by the State.

Stockpiles upon which payment is based are to be exclusively for the referenced project and no sales or other removal to be made therefrom without consent of the purchaser.

The agreement thus contained language which, contrary to A & G's position, implies that payment was to be based on the materials placed in the stockpile.

We must, therefore, look to the surrounding circumstances and intent of the parties to interpret the agreement.[10] The surrounding circumstances, as found by the trial court, were that the hot rock was not weighed at the stockpile, that Reid was unaware of this at the time of the agreement and when it commenced performance, and that A & G was aware of Reid's ignorance.[11]

In *Day v. A & G Constr. Co., supra,* 528 P.2d at 445, we held that an agreement is to be interpreted according to the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party, and the meaning which the recipient of the communication might reasonably

6. *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d 826, 833–34 (Alaska 1974); *Day v. A & G Constr. Co., Inc., supra.*

7. *See National Bank of Alaska v. J. B. L. & K. of Alaska, Inc., supra; Day v. A & G Constr. Co., Inc., supra,* 528 P.2d at 443; *Hendricks v. Knik Supply, Inc.,* 522 P.2d 543, 546 (Alaska 1974); *Smalley v. Juneau Clinic Bldg. Corp.,* 493 P.2d 1296, 1305 (Alaska 1972); *Port Valdez Co. v. City of Valdez,* 437 P.2d 768, 771–72 (Alaska 1968); *Pepsi-Cola Bottling Co. v. New Hampshire Ins. Co.,* 407 P.2d 1009, 1013 (Alaska 1965), cases where this court determined whether contract provisions were ambiguous or not.

8. *See,* for example, *National Bank of Alaska v. J. B. L. & K. of Alaska, Inc., supra; Day v. A & G Constr. Co., Inc., supra,* 528 P.2d at 433; *Bakery & Confectionary Workers v. Great A. & P. Tea Co.,* 357 F.Supp. 1322, 1325 (W.D.Pa.1973), *affirmed,* 491 F.2d 748 (3rd Cir. 1974); *Chris Berg, Inc. v. United States,* 455 F.2d 1037, 1044, 197 Ct.Cl. 503 (1972); *Clark v. Prudential Ins. Co. of America,* 204 Kan. 487, 464 P.2d 253, 256 (1970).

9. Since the D1 and sand were placed directly on the road, the state had an employee at the stockpile to weigh that material. This "State accepted scale ticketed tonnage" was directly related to the amount of D1 and sand in the stockpiles.

10. *See* cases cited at note 6. *See also* "Requirements of Certainty in Land Sale Contracts", 5 UCLA-Alaska L.Rev. 1112, 125–28 (1975), and Erwin, "Parol Evidence or Not Parol Evidence in Alaska", 8 Alaska L.J. 20 (1970), for a discussion of the use of parol evidence in Alaska to clarify ambiguous contract terms.

11. The trial court found that:
 No state tickets were issued at the place of delivery. Plaintiff was ignorant of this at the time Plaintiff entered into said contract and commenced performance thereunder. Defendant was aware of such ignorance on the part of Plaintiff.

have given to it. The trial court found that:

> Under the circumstances it would be unreasonable to expect the Plaintiff [Reid], as material supplier, to bear the risk of loss for whatever inefficiency of Defendant or loss of hot rock involved in the manufacture of the hot bituminous pavement.

We agree. A reasonable merchant would expect to be paid for all material supplied to a purchaser. Therefore, we find no error in the trial court's conclusion that Reid was entitled to payment for all conforming material delivered to the stockpile.

## II

The agreement provided that a "tentative stockpile payment will be at 75 percent of the unit price. Payment is to be made within ten days of payment by the State". The trial court found that A & G was late on portions of the payments for nine of the ten pay periods (all but the first).

A & G contests the trial court's award of $3,625.75 (amended judgment) for interest on late payments and $173.67 for the interest on short-term loans taken by Reid that were caused by the late payments. A

& G argues that there was no evidence presented that would justify the trial court's finding that A & G was less than timely with their payments.

For most of the pay periods, A & G made some payment within the agreed ten-day period, but usually did not make the complete payment required. A & G contended at trial that it had the right to retain part of the payments due as security for Reid's future performance. Although the court made no specific finding of fact or law with regard to this issue, it clearly rejected this contention when it awarded the interest on late payments.

When Reid delivered the materials, A & G was obligated to pay for them in accordance with the contract.[12] The contract does not contain any provision for the withholding of any part of the payment due, nor was there any evidence presented at trial which would indicate any agreement to that effect. Therefore, the trial court was correct in finding that A & G made insufficient payments or was otherwise late in meeting its contractual obligations.

The specific amount of interest awarded, however, is incorrect.[13] We,

---

12. AS 45.05.070 [U.C.C. § 2–301]; AS 45.05.144 [U.C.C. § 2–507].

13. The trial court adopted Reid's calculation of deficiencies and interest payments, and A & G contests the accuracy of the calculations. These calculations did not include two $20,000.00 payments made during the winter of 1971–72. Reid was due 75 percent of the contract price when the material was placed in stockpile and was to receive the other 25 percent when the material was placed on the road. In the fall of 1971, Reid delivered approximately 18,600 tons of D1 to Scow Bay. About 18,600 tons of D1 were also located at Reid's own yards in Thomas Bay. The state paid A & G for both amounts, or for 37,200 tons of D1. Reid was only due the contract price for the 18,600 tons in Scow Bay. Thus Reid should have received 75 percent of (18,600 x $2.65) or $36,967.50. A & G paid Reid $48,892.00 so there was then a surplus payment of $11,924.50. The calculations adopted by the trial court do not show any such surplus.

The project was halted during the winter of 1971–72. No materials were placed on the road until May of 1972. Therefore, Reid was not due the remaining 25 percent of the contract price until May.

During the winter, however, A & G made two payments of $20,000.00 to Reid. The trial court's calculations do not account for these payments. The result should have been a surplus at that time of $51,924.50.

When work resumed in the spring of 1972, the 18,600 tons of D1 which had remained in Reid's own yards during the fall of 1971 were in the stockpile at Scow Bay, and an additional 16,852 tons of D1 were placed in stockpile. Reid was, therefore, due 75 percent of the contract price of this 35,452 tons, or $70,460.85. There were 21,723 tons of D1 placed on the road, therefore, Reid was also due the remaining 25 percent of the contract price for those 21,723 tons, or $14,391.49. Thus, the total amount due and owing at that point was $84,852.34.

A & G paid an additional $40,000.00 during this pay period (spring of 1972), and thus,

therefore, remand the matter to the court for a recalculation of the amount of interest.

## III

A & G contests the award of $5,888.00 for 5,888 tons of D1. The lower court found that as to that additional quantity of D1, the original contract setting a price of $2.65 per ton had been modified to $3.65 per ton.

The original agreement did not contain any reference to the amounts of material to be supplied. On August 30, 1971, A & G sent Reid a purchase order for 59,466 tons of D1, 21,780 tons of hot rock, and 2,500 tons of sand.

In the summer of 1972, Mr. Hardesty, A & G's superintendent, orally informed Mr. Reid that an additional 10,000 tons of D1 would be needed.[14] Mr. Reid replied that the D1 could be furnished, but that the price would have to be increased $1.00 per ton to $3.65 per ton. Mr. Hardesty asked Mr. Reid to send a letter on the subject. The letter was sent on July 13, 1972 and read:

On any additional D1 to be delivered from this date we will have to have $3.-65 a ton as we are not breaking even. We have already delivered the original order but understand you need about 10,000 ton more.

Yours truly
[No personal signature]
Glenn W. Reid

The 5,888 additional tons were used by A & G for the project. A & G paid Reid only $2.65 for the additional D1.

A & G contends that Reid's claim for the additional sum is barred by the statute of frauds. AS 45.05.050 ("Formal requirements; statute of frauds") [U.C.C. § 2–201(1)(2)] specifies, in pertinent part:

(a) Except as otherwise provided in this section a contract for the sale of goods . . . for the price of $500 or more is not enforceable by action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. . . .

(b) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of (a) of this section against the party unless written notice of objection to its contents is given within 10 days after it is received.

A & G cites subsection (A) and argues that since the letter from Reid to A & G was the only writing evidencing the modified agreement, and since A & G, the party to be charged, did not sign the writing, the statute of frauds was not satisfied.

Section (a) of AS 45.05.050 begins "[e]xcept as otherwise provided in this section . . . ." Therefore, the necessity of the signature of the party to be charged required by subsection (a) is not absolute —it may be dispensed with if certain conditions set forth in subsections (b) and (c) are satisfied.

---

with the accumulated surplus of $51,924.50, A & G paid $91,924.50 for this period. This still left a surplus of $7,072.16. The lower court's calculations, however, show a deficiency of $7,884.84 against A & G. This error of $14,957.00—the surplus payments by A & G plus the deficit incorrectly calculated against A & G ($7,072.16 + $7,884.84)— also infects all of the remaining calculations of deficiencies and interest.
Furthermore, the lower court used 8 percent as the percentage of interest owed on late

payments up to the date of the amended judgment. An interest rate of 8 percent is applicable to amounts owed after judgment is rendered. AS 09.30.070. Interest on late payments prior to judgment is 6 percent in the absence of an express agreement as to the interest rates. AS 45.45.010.

14. There is no question as to Mr. Hardesty's authority to bind A & G.

Subsection (b) dispenses with the signature requirement if the following conditions are met:

1) the agreement is one between merchants;

2) the writing in confirmation is sent within a reasonable time after the agreement is reached;

3) the writing is sufficient as against the sender [i. e. would satisfy subsection (a)];

4) the party receiving it had reason to know of the contents; and

5) no written notice of objection is sent to the sender within 10 days of its receipt by the party to be charged.

Here there is no question as to criteria (1),[15] (2), and (4).

Criterion (3) requires that the writing be sufficient as against the sender, in this case, Reid. The letter from Glenn Reid to Fred Hardesty confirming the oral agreement indicates that a contract for sale had been made between the parties—approximately 10,000 tons of additional D1 at $3.65 per ton. The writing thus complied with the portion of subsection (a) of AS 45.05.050 requiring it to be sufficient to indicate that a contract for sale had been entered between the parties. The question remains as to whether it may be regarded as sufficient against Reid, "the sender", so as to come under the exception set forth in subparagraph (b). This, in turn, depends on whether a typewritten signature may be

adequate. The letter did not contain Mr. Reid's personal signature. "Glenn W. Reid", however, was typed at the end of the letter.

 Section 45.05.020(39) [U.C.C. § 1–201(39)] defines "signed" as including "a symbol executed or adopted by a party with present intention to authenticate a writing". The official comments to U.C.C. § 1–201 state that:

> The inclusion of authentication in the definition of "signed" is to make clear that . . . a complete signature is not necessary. Authentication may be printed, stamped, or written; it may be by initials or thumbprint. It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead. No catalog of possible authentications may be complete . . . .

A typed name is sufficient to meet this requirement.[16]

 As to criterion (5), A & G did not send any written notice of objection. In its brief, A & G states that "[b]y telephone, George Atkinson informed Appellee that the money would not be paid". A & G does not cite any portion of the record in support of this allegation, and an independent review of the record and trial transcript has not revealed any supporting material. Furthermore, even if Mr. Atkinson did object by telephone, this does not meet the statutory requirement of a "written notice of objection".[17]

---

15. AS 45.05.042(a) [U.C.C. 2–104(1)] defines "merchant" as meaning

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . .

"Goods" is defined in AS 45.05.044(a) [U.C.C. § 2–105(1)] as "all things . . . which are movable at the time of identification to the contract for sale" and, furthermore,

> A contract for the sale of timber, minerals, or the like . . . is a contract for the sale of goods . . . if they are to be severed by the seller . . . . AS 45.05.048(a) [U.C.C. § 2–107(1)]

Both Reid and A & G dealt with the materials here involved and held themselves out as having knowledge or skill with reference thereto.

16. *See*, for example, *Benedict v. Lebowitz*, 346 F.2d 120 (2nd Cir. 1965), where the typewritten name of party added to a security agreement was a sufficient signature to satisfy the statute of frauds.

17. In its reply brief, A & G quotes from *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 95 n. 19 (Alaska 1974), to the effect that written notice of objection is not required because it would place too onerous a burden on that party. *Holiday Inns*, however, was not decided under the Uniform

In the absence of a written objection from A & G, the confirmatory letter sent by Reid to A & G meets the requirements of AS 45.05.050, and accordingly the claim for the modified price as to additional D1 was not barred by the statute of frauds.[18]

## IV

A & G also contends that the original agreement was a requirements contract and that Reid, under the agreement, was obligated to supply all the necessary D1 at $2.65 per ton.

We need not reach the issue of whether or not the original agreement was a requirements contract, for even if it were, the agreement was modified pursuant to AS 45.05.066 [U.C.C. § 2–209].

AS 45.05.066 ("Modification, recission, and waiver") provides in pertinent part:

(a) An agreement modifying a contract within § 36–242 of this chapter needs no consideration to be binding.

. . . . . .

(c) The requirements of the statute of frauds section (§ 50) must be satisfied if the contract as modified is within its provision. . . .

The only requirement for a valid modification of the original agreement between Reid and A & G is that the modification must meet the statute of frauds.[19] There

is no requirement of additional consideration.[20] Since the letter from Reid to Fred Hardesty to which there was no written objection met the requirements of the statute of frauds (*see supra*), it operated as a valid modification. Therefore, the lower court's holding that there was a valid modification of the original contract that increased the price of 5,888 tons of D1 to $3.65 per ton was correct.

## V

A & G contends that even if the agreement was modified with respect to the price of D1, hot rock, and overtime payments, there was a breach of performance by Reid with respect to the timely delivery of those materials.

A & G argues that since the only written memorandum on the increase in price concerning the hot rock stated "upon completion of quantities . . .",[21] A & G's duty to pay the additional sums did not arise until Reid had timely completed delivery of the hot rock. A & G points to the state's assessment of 13 days liquidated damages against A & G and states that this penalty "was due and owing only because of [Reid's] failure to perform".

A & G's position is as follows: Reid did not supply the material on time; A & G had to halt the paving of the road frequently because of insufficient materials;

Commercial Code since the subject of that contract was the breach of a franchise agreement to construct a Holiday Inn. The court recognized this difference in the cited footnote when it referred to the Uniform Commercial Code as contrary authority in a different situation: *"but see,* AS 45.05.066 respecting Uniform Commercial Code Sales".

18. Even if the writing was not sufficient to satisfy the statute of frauds, A & G would still be obligated to pay for the 5,888 tons of D1.
AS 45.05.050(c)(3) provides:
 (c) A contract which does not satisfy the requirements of (a) of this section but which is valid in other respects is enforceable.

. . . . .

(3) with respect to goods for which payment has been made and accepted or which have been received and accepted.
Since the 5,888 tons were received and accepted by A & G, the statute of frauds prohibitions of the U.C.C. are inapplicable.

19. In addition, other provisions of the U.C.C. imply the obligation of good faith on the parties to the agreement. AS 45.05.024 [U.C.C. § 1–203]; AS 45.05.004(c) [U.C.C. § 1–102(3)].

20. *See Skinner v. Tober Foreign Motors, Inc.,* 187 N.E.2d 669 (Mass.1963).

21. The only written memorandum on this subject is a note on A & G's pay estimate which says: "Upon completion of quantities, additional 0.30 per ton will be paid as verbally agreed".

the increases in price and the agreement to pay overtime were efforts to get the crucially needed supplies and even with these incentives, Reid's delays caused the failure to complete the project on time.

Reid, on the other hand, although agreeing that it would not be entitled to full payment if it was late in its deliveries or otherwise breached any delivery conditions, denies that it was ever guilty of any such breach.

The testimony on this issue is hopelessly conflicting, and the trial court did not directly deal with this issue in its findings of fact.

 We need not reach the issue of whether there was a failure of consideration in Reid's alleged breach of an implied contract condition since A & G never made timely objection. Even if Reid's tender of delivery was nonconforming, A & G was still obligated to pay for the full value of the materials delivered in the absence of such an objection. Assuming that Reid was late or that the delivery of the material was deficient in any respect, AS 45.05.-162 [U.C.C. § 2–601] ("Buyer's rights on improper delivery") provides that

> . . . if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
>
> (1) reject the whole;
>
> (2) accept the whole; or
>
> (3) accept any commercial unit and reject the rest.

A & G in this case did not reject any of the alleged deficient deliveries but instead accepted the materials and used them in the project.[22]

AS 45.05.174 [U.C.C. § 2–607] ("*Effect of acceptance; notice of breach; burden of establishing breach after acceptance*") provides:

(a) The buyer must pay at the contract rate for any goods accepted.

. . . . . .

(c) If a tender has been accepted,

(1) the buyer must, within a reasonable time after he discovers or should have discovered a breach, notify the seller of the breach or be barred from any remedy;

. . . . . .

(d) The burden is on the buyer to establish a breach with respect to the goods accepted.

If A & G believed that the deliveries were late, it should have notified Reid within a reasonable time. The requirements for such notice are not formal, and the notice in this instance did not have to be written. According to Official Comment 4 to the U.C.C. § 2–607:

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (§ 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and this opens the way for normal settlement through negotiation.[23]

22. AS 45.05.172 [U.C.C. § 2–606]; *see* discussion of A & G's acceptance of materials *supra* at note 2.

23. *See*, for example, *Lewis v. Mobil Oil Corp.*, 438 F.2d 500, 509 (8th Cir. 1971) (indication by buyer that transaction is still troublesome and must be watched is sufficient notice); *Traynor v. Walters*, 342 F.Supp. 455 (M.D.Pa.1972) (rejection of non-conforming goods by telephone sufficient); *Jay V. Zimmerman Co. v. General Mills, Inc.*, 327 F. Supp. 1198, 1204 (E.D.Mo.1971) (telephone discussions between buyer and seller regarding seller's late delivery was sufficient notice of breach to seller). *See also* 2 Anderson,

There is nothing in the record to show that A & G gave Reid any notice whatsoever that the deliveries were incomplete, late or nonconforming in any respect. Since A & G accepted the goods, and since there was no notification to Reid that the deliveries were insufficient or late, A & G must pay for the accepted goods at the contract price,[24] and A & G is barred from any subsequent remedy, including deduction of damages from the price to be paid. AS 45.05.226 [U.C.C. § 2–717].[25]

## VI

A & G's final contention is that all modifications of the original agreement should be voided because they were the result of economic duress. Reid had shut its crusher down for one day, and A & G contends that Reid threatened to cease deliveries unless its demands for increased payments were met. A & G states that there was no other source of rock available. Reid, on the other hand, argues that any pressure put on A & G by Reid was only to receive payments already due under the original contract and was not to secure any additional economic advantage.

A contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will. . . .[26]

■ Although the issue of economic duress was argued before it, the trial court did not make any findings of fact or conclusions of law with regard to that contention. Since we are unable to determine whether the court considered this issue, it is necessary to remand the case for further findings and conclusions.[27]

## VII

Both A & G and Reid appeal from two of the trial court's factual findings. A & G contends that there was insufficient evidence to support the trial court's finding that 6,067.55 tons of hot rock were lost between the stockpile and road, while Reid argues that the court erred when it held

Uniform Commercial Code, "Sales" § 2–607:25, 26.

24. A & G cites this court to a general principle of contract law concerning failure of consideration, contained in Williston on Contracts, § 814. The effect of such general principles where specific code provisions are applicable was discussed by this court in *Prince v. LeVan*, 486 P.2d 959, 962 (Alaska 1971):

> It appears then, that general principles of contract law remain in effect, to some extent, under the code. Nevertheless, even when general principles remain operative, they merely supplement the code; they do not displace it so as to exclude application of its specific provisions where relevant.
> Where both the code and general principles are available, the former should always be considered and applied if applicable. By legislative declaration the code is the law, and if general principles appear inconsistent, they must be considered displaced under AS 45.05.006. Moreover, even where inconsistency does not exist, the code must be regarded as supreme; general principles even when consistent with the code are merely supplementary. (footnote omitted)

25. 2 Anderson, Uniform Commercial Code, "Sales", § 2–607:9, at 209:

> Where the goods are delayed in reaching the buyer, the latter waives his right to claim damages for breach of contract by way of delay when he accepts the goods without a reservation of rights or fails to give notice of breach thereafter. (footnotes omitted)

26. *Austin Instrument, Inc., v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533, 535 (1971). *See also W. R. Grimshaw Co. v. Mevil C. Withrow Co., Inc.*, 248 F.2d 896, 904 (8th Cir. 1957), *cert. denied*, 356 U.S. 912, 78 S.Ct. 669, 2 L.Ed.2d 585 (1958) ("The assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities"); *Alloy Products Corp. v. United States*, 302 F.2d 528, 530–31, 157 Ct.Cl. 376 (1962); *Kohen v. H. S. Crocker Co.*, 260 F.2d 790 (5th Cir. 1958).
In addition, AS 45.05.024 [U.C.C. § 1–203] provides: "Every contract or duty in this chapter imposes an obligation of good faith in its performance or enforcement." *See also* AS 45.05.004(c) [U.C.C. § 1–102(3)].

27. *Graham v. Rockman*, 504 P.2d 1351, 1355 (Alaska 1972).

that Reid did not meet its burden of proof on its contention that A & G appropriated 800 tons of rejected D1 for its own use.

The appropriate standard of review was set forth in *Ficke v. Alaska Airlines, Inc.,* 524 P.2d 271, 274 (Alaska 1974):

> Our review of the superior court's findings has been guided by Alaska Rule of Civil Procedure 52(a) which requires:
>
>> In all actions tried upon the facts without a jury . . . [f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.
>
> We have said before that the effect of Civil Rule 52(a) is to allow us to reject a trial court finding only
>
>> when, although there may be evidence to support it, we are left with the definite and firm conviction on the entire record that a mistake has been committed.
>
> *Alaska Foods, Inc. v. American Mfr's. Mut. Ins. Co.,* 482 P.2d 842, 848 (Alaska 1971) (footnote omitted).

 Upon reviewing the record, we hold that the court's questioned findings are adequately supported by the evidence.

In conclusion, we affirm the trial court's decision in all respects except as to the

> amount awarded Reid for interest on late payments and
>
> findings and conclusions on the issue of economic duress.

This case is remanded to the trial court for a recalculation of the interest and for the purpose of making findings and conclusions of law with reference to economic duress. In the event that the court should find that there was economic duress, the judgment should be amended accordingly.

AFFIRMED IN PART AND REMANDED IN PART.