**Goldie TSAKRES, Appellant,**

v.

**William A. OWENS et al., Appellees.**

**No. 2937.**

Supreme Court of Alaska.

April 8, 1977.

Richard C. Eckert, Anchorage, for appellees.

Before BOOCHEVER, C. J., RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

ERWIN, Justice.

This case presents several allegations of error arising from an action in which the lessor/plaintiff sought declaratory relief and damages for the withholding of possession of real property. The allegations of error all involve the interpretation given a lease which constituted the agreement between the parties concerning the subject property. The trial court ruled in favor of the lessee/defendants. The issues present in this appeal will be addressed after a statement of the facts.

William C. Wester owned a building and lot at 436 "D" Street. He leased out a portion of the building to Tex Powell, who operated a business therein known as the Carriage Inn. Tex Powell died in 1972, leaving the business to his wife Cynthia, who decided she could not run the business and therefore put it up for sale.

Cynthia Powell asked William A. Owens (appellee herein), who was a friend of the Powells, if he wanted to buy the business. Owens asked if there was a current lease on the building, and Mrs. Powell said that it had three-and-one-half years to run; however, she did not have a copy of the lease. Thereafter appellee Owens went into possession.

Owens then asked Wester for a copy of the lease and Wester refused, saying that he was going to build on the property. Thereafter Wester sent Owens an eviction notice. Wester claimed he wanted to use the space for a bar, but this use never occurred.

Mrs. Powell owned restaurant furniture which Owens was interested in buying, but before purchasing it he wanted assurance that he could stay on the property. Upon receiving the eviction notice, Owens told Mrs. Powell that he could not buy the business. Wester then told Owens that he had made a mistake by sending the eviction

Ernest Z. Rehbock, Anchorage, for appellant.

notice. Owens at that time was ready to move out and told Wester that he could not buy the equipment and furniture with the threat of an eviction notice present.

Thereafter Owens and Wester entered into negotiation for use of the subject property. Owens testified:

Then on the 9th he [Wester] came over and he said his bookkeeper had made a mistake and I wasn't supposed to have received an eviction notice and I told him that I was ready to go and I couldn't stay there. I couldn't buy the furniture and their equipment with an eviction notice. And he said he would give me a lease until May of '73 and I said that's only 4 months, 5 months away and I can't buy this furniture and pay for it over a period of 5 or 10 years with a 4 or 5 months lease. So he—he says, I'll give you a lease until May or until a new building is built and I said, well, I have to have some sort of lease on the new building if you're going to build in May. And he said all right. I'll give you a 5-year with a 5-year option at $1.00 a square foot and I felt that I had a lease for the length of the time it would take me to pay for the furniture.[1]

■ "Professor Joe Fedor" was hired by Wester to draw up a lease agreement.[2] The "Lease Agreement for Carriage Inn" was executed on January 9, 1973, between William C. Wester and Zula Swanson as the lessors and William Owens, Fern Owens and Glen Dale as lessees. The lease was thereafter recorded.

Glen Dale, a partner of Owens and a signatory of the lease agreement, was present during the negotiations. His understanding was that a lease was made so the business could remain for ten years whether in the old or new building. Owens and Dale proceeded to buy fixtures and furniture from Cynthia Powell for $17,000, with terms for ten years.

Wester's interpretation of the document was different from that of Owens and Dale. Wester had the impression the document would serve Owens to "stay" so that when construction began on the new building, Owens could exercise an option for lease in the new building. However, Wester testified that the thought of Owens having at that time a 5-year lease in the old building did not cross his mind.

With the lease Owens signed a letter of intent to be used to help Wester obtain financing for the new building. Other potential lessees were also approached and signed letters of intent.

Wester was not able to go through with his building plans, because financing did not work out. His wife Zula Swanson also died, and he "was involved in closing the estate." In the process of Wester's closing of Zula Swanson's estate, the subject property was sold to Goldie Tsakres [appellant herein].

John Grames, son of Goldie Tsakres, tried to develop the property for Tsakres but had no success. Grames testified that one of the difficulties to developing the property was the "cloud" on the title created by the record of "Carriage Inn Lease."

Tsakres filed a complaint in superior court for forcible entry and detainer against Owens on September 12, 1974, seeking return of premises known as 436 "D" Street in Anchorage.

By her amended complaint of October 10, 1974, Tsakres asked for declaratory relief and for damages for withholding possession, alleging that a writing executed between her predecessor in title to the land and Owens must be declared void. The subject writing has the following terms:

---

1. Record of Appeal, Transcript Vol. 1, p. 30.

2. In a controversy such as the one presently before us, where we are called upon to interpret a contract, we proceed with this task working within the general rule that ambiguous language in a contract is to be construed most strongly against the party by whom the contract was prepared. *See Pepsi Cola Bottling Co. v. New Hampshire Insurance Co.*, 407 P.2d 1009, 1013 (Alaska 1965); *Lumbermens Mut. Cas. Co. v. Continental Cas. Co.*, 387 P.2d 104, 108 (Alaska 1963); *Eastmount Constr. Co. v. Transport Mfg. & Equip. Co.*, 301 F.2d 34, 41 (8th Cir. 1962); 17A C.J.S. Contracts § 324, p. 217 (1963).

LEASE AGREEMENT FOR CARRIAGE INN:

PART I: This lease agreement is between Zula Swanson Wester and William C. Wester and William Owens and Fern Owens and Glen Dale for lease of the Carriage Inn at 436 "D" Street, Anchorage, Alaska.

PART II: This lease agreement is to be in effect from January 9, 1973 until May 1, 1973 or until building commences at 434 "D" Street, Anchorage, Alaska.

PART III: This lease agreement is for a rental of $500 per month payable on the first of each month, plus Lessees agree to pay their own utilities.

PART IV: Lessor agrees to offer lessees a new lease in the new building for 5 years with option to extend for additional 5 years at $1 per square foot for a 25' × 50' space on the alley and of the building.

Appellant Tsakres now raises two allegations of error [3] which require adjudication following the ruling of the court below favoring the defendants. The first of appellant's allegations is: The lease was not ambiguous in the sense of relaxation of the parol evidence rule.

The trial court determined that the agreement was ambiguous "in that no provision [was] made in the event construction on a new building [did] not begin during the 1973 construction season or if a new building [was] never constructed." Thereafter it admitted parol evidence in order to aid in the interpretation of the lease.

Appellant Tsakres contends that the court's finding of ambiguity goes to the heart of the legal effect of the lease and not to whether the lease is ambiguous. Rather, Tsakres contends, the document most clearly states that which it covers, and there is present no technically ambiguous language. Appellee Owens alternatively contends that a contract is ambiguous if subject to various interpretations. And therefore "a contract can certainly be ambiguous if the language indicates some clause or word is apparently missing which would clear things up."

The threshold question must therefore be, was the admission of parol evidence proper on these facts? This court has repeatedly stated that where a term in a written contract is ambiguous, extrinsic evidence of surrounding circumstances may be admitted to aid in the interpretation of the intent of the parties in order to resolve the ambiguity.[4]

The test for determining ambiguity in a contract is whether in light of all the surrounding circumstances the contract is capable of more than one reasonable meaning,[5] for without ambiguity the prerequisite for admissibility of parol evidence is lacking.[6]

As we recently stated in *Wessells v. State*, 562 P.2d 1042 (Alaska, 1977), in order to ascertain the meaning of words and phrases we will follow the principles of contract interpretation set forth in *National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579, 584–86 (Alaska 1976). As we noted in *Wessells*, 562 P.2d at page 1046, this involves a two-step analysis. There we stated:

In the first stage, we will look to both the language of the lease and extrinsic evidence to determine if the wording of the lease is ambiguous. The mere fact that two parties disagree as to the interpretation of a contract term does not

3. Specifically, appellant raises the following:
I: The lease agreement was not "ambiguous" in the sense of relaxation of the parol evidence rule.
II: The "Carriage Inn" lease resulted in a tenancy at will after May 1, 1973, and was, otherwise, obnoxious to the rule against perpetuities.

4. *National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579, 582, n. 2 (Alaska 1976).

5. *National Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579 (Alaska 1976); *A & G Construction Company, Inc. v. Reid Brothers Logging Company, Inc.*, 547 P.2d 1207 (Alaska 1976).

6. *Port Valdez Company, Inc. v. City of Valdez*, 437 P.2d 768 (Alaska 1968).

create ambiguity. An ambiguity exists only where the disputed terms are reasonably subject to differing interpretations after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms.

If we determine that the language is ambiguous, we will proceed to the second state of analysis and consider extrinsic evidence to attempt to resolve this ambiguity. (Footnotes omitted)

Thus, it becomes necessary to focus on provisions II and IV of the agreement, and to view these provisions in light of the surrounding circumstances of the documents' formation. These provisions read:

PART II: This lease agreement is to be in effect from January 9, 1973, until May 1, 1973, or until building commences at 434 "D" Street, Anchorage, Alaska.

PART IV: Lessor agrees to offer Lessees a new lease in the new building for five years with option to extend for additional five years at $1.00 per square foot for a 25′ × 50′ space on the alley and of the building.

The trial judge in his Memorandum of Decision found in reading the terms of the written lease and hearing the extrinsic evidence surrounding these terms that:

The defendants and Mr. Wester expected to have the relationship of tenant and landlord for five years with the possibility of an additional five year term plus a short period before the new building was constructed. Mr. Wester was aware of Mr. Owens' need for a long term lease. Mr. Owens would not have purchased the restaurant fixtures from Mrs. Powell if Mr. Wester would not have leased the premises for a sufficiently long term to assure Mr. Owens of a location for the restaurant in order to make the purchase economically feasible.

The document is interpreted to reflect the reasonable expectations of the parties, i. e., a five year lease with an option to renew for an additional five years.

The rental rate of $500.00 per month will continue as long as the premises remain the existing building, if a new building is constructed the rental rate will be $1.00 per square foot after January 9, 1978 for at least a 25 foot by 50 foot space on the ground floor on the alley end of the building plus utilities. . . .[7]

■ In analyzing this agreement, our standard of appellate review is that which we articulated in *Day v. A & G Construction Company, Inc.,* 528 P.2d 440, 443 (Alaska 1974). There we stated the interpretation of words is a matter for the court, while resolution of a dispute as to the surrounding circumstances is for the trier of facts. Questions pertaining to the meaning to be given to the words of the contract are to be considered in the same manner as questions of law. Consequently, this court, in interpreting the words of a contract, is not bound by the lower court's views, and the "clearly erroneous" standard used in reviewing a trial court's factual findings is inapplicable.[8]

■ In examining the agreement it becomes apparent the court below properly concluded that no express provision was made to cover the situation where no building was undertaken. Further, the language of Part II of the agreement which reads "until May 1, 1973 or until building commences" could easily be read either to mean (1) that the express May 1, 1973 date of termination could be cut short in the event of early construction, (2) that the May 1, 1973, date was thought to be the time construction was to start with the actual operative language being "or until building commences," or (3) that the May 1, 1973, date set the earliest possible date of termination of the lease.

The court thus found that existing language of the lease was subject to various interpretations when it was applied to the factual development which took place in this case, a failure to build a new building. In accord with the method we set forth in

7. Record of Appeal, Vol. 1, pp. 20–21.

8. *Peters v. Juneau-Douglas Girl Scout Council,* 519 P.2d 826, 833–34 (Alaska 1974).

*National Bank of Alaska,* the court examined the surrounding circumstances and then sought to turn the words of the lease into equivalent realities. It was only then that the court found the language of the lease could be interpreted to reach different results.

We accordingly find that the contract was subject to various interpretations, and thus the admission of parol evidence was proper. We have further examined the interpretation given the lease by the lower court and find that it is supported by the evidence introduced below.

■ Examining the interpretation given the lease by the court below, we note that the court found:

> The defendant and Mr. Wester expected to have a relationship of tenant and landlord for five years with the possibility of an additional five year term plus a short period before the new building was constructed.[9]

From this we can reason that the court read clauses II and IV of the lease together to reach this result. Such an approach to contract interpretation is in accord with *Corbin on Contracts,* Vol. 3, § 549, p. 183 (1960). Further, this interpretation is supported by the length of the payment term for the purchase of the furniture which Owens was acquiring from the prior lessee. Thus the ambiguity arose within the language of this lease once the supposed new building was not constructed. This ambiguity was created both by the express terms of the agreement and the absence of certain terms. We concur with the court below in its interpretation which cured this ambiguity.

9. Record on appeal, Vol. I, pp. 20–21.

10. The rule as set forth by John Gray in 1855 reads:
> No interest is good unless it must vest, if at all, not later than twenty-one years after

■ The interpretation of the court below vests the rights and duties arising under clause IV of the lease at the time of the lease's execution, thus taking the lease out of the scope of the rule against perpetuities [10] which forms the basis of the appellant's second contention of error.

Accordingly, we AFFIRM the court below.

BOOCHEVER, C. J., with whom RABINOWITZ, J., joins, concurring.

For the reasons set forth in Footnote 39 of the opinion in *Wessells v. State,* 562 P.2d 1042 (Alaska 1977), I believe that in all cases the introduction of relevant extrinsic evidence should be allowed to determine the reasonable expectations of the parties. I do not think that the trial court should be obliged to utilize the two-tiered approach of first considering extrinsic evidence in order to determine whether the term is ambiguous and then utilizing the same evidence to interpret the ambiguity. Instead, I believe that courts should be permitted to hear evidence as to all relevant circumstances bearing on the construction of a disputed term and then utilize that evidence in interpreting the language in question. My views on this subject are amplified in Footnote 39 of the *Wessells* opinion.

some life in being at the creation of the interest. *Gray Rule against Perpetuities* § 201 (4th Ed. 1942)