**ATLAN INDUSTRIES, INC., a corporation, Plaintiff,**

v.

**O.E.M., INC., a corporation, Defendant.**

**Civ. A. No. CIV–82–853–W.**

United States District Court, W.D. Oklahoma.

Jan. 7, 1983.

James Vogt, Reynolds, Ridings & Hargis, Oklahoma City, Okl., for plaintiff.

James C. Chandler, David E. Nichols, Lytle, Soule, Curlee, Harrington, Chandler & Van Dyke, Oklahoma City, Okl., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge, Sitting by Designation.

This case involves a complaint for the price of goods sold by plaintiff to defendant. Defendant denies liability for the price of the goods, and contends that the goods contained a latent defect which caused them to be unacceptable and out of conformity with the specifications in the sales contract between plaintiff and defendant.

Plaintiff is a prime supplier of reground plastic and wide specification machinery in the plastics industry. The goods in dispute between defendant and plaintiff are nine hundred thirty-five pounds (935 lbs.) of "Noryl-R-Beige FN 215" at eighty-five cents (85¢) per pound, as described in plaintiff's invoice No. 16886; nine thousand nine hundred fifty pounds (9,950 lbs.) of "Noryl-R-Grey FN 215" at eighty-five cents (85¢) per pound, as described on plaintiff's invoice No. 17114; and seventeen thousand two hundred ninety-five pounds (17,295 lbs.) of "Noryl-R-Grey FN 215" at eighty-five cents (85¢) per pound, as described on plaintiff's invoice No. 17449.

FN 215 is a high density, very hard plastic used primarily in the computer industry for making computer cabinets. There are two types of FN 215 on the market. "Virgin" FN 215 is plastic material which has never been molded and is manufactured only by General Electric. FN 215 "regrind" is plastic which has been molded once or more in its life, has been scrapped and has been ground for use again in a molding process. Defendant is a company which molds plastic into various parts and sells them to the computer industry. Defendant was under contract to a computer company, Magnetic Peripherals, Inc. (hereinafter MPI), to mold a number of computer cabinet parts from FN 215. Plaintiff agreed to supply defendant with raw FN 215 for this molding job. Plaintiff did not know the end use of the FN 215 it was supplying to defendant, and the name of the user was kept secret.

After agreeing to supply defendant with FN 215, plaintiff contacted a supplier about a supply of reground FN 215. Plaintiff tested the FN 215 for contamination and foreign matter, and forwarded a 935-pound sample of the FN 215 to defendant for testing.

In the plastics industry, it is a common practice for a supplier of raw plastic to forward a sample to the molder for testing. The purpose of the test is to see if the plastic material will mold well. No injection molder has facilities to do any other test. The reason for testing regrind material is that some regrind is badly contaminated with metal, which clogs the injection molding equipment and requires the molding machine to be shut down and cleaned. "Regrind" is plastic which has been molded once, and then is ground into pellets to be re-used. The regrinding process sometimes leaves small pieces of metal and metal chips in the plastic.

FN 215 is an expensive plastic which is specially compounded for use in office machines and computers. FN 215 is heat sensitive, but is able to withstand temperatures of at least two hundred five degrees (205°). Because the material is generally used in office machines and computers, it is almost always painted after molding to improve its cosmetic appearance. Defendant does not paint the parts it molds; they forward them to the ultimate user, who paints them.

The particular shipments involved in this lawsuit were molded by defendant and forwarded to their ultimate user, MPI. MPI painted the parts and heated them in an infrared oven to dry the paint. The parts molded from FN 215 "regrind" supplied by plaintiff warped when exposed to the temperature of the infrared heat ovens. The computer parts were warping when exposed to temperatures of between one hundred thirty degrees (130°) and one hundred seventy degrees (170°). Noryl FN 215 will not warp at this temperature range. Defendant molded the entire shipment of Noryl FN 215 into computer parts and tendered them to MPI before the problem surfaced. MPI immediately rejected the goods as defective and non-conforming because of the warping problem. Defendant immediately notified plaintiff that MPI had rejected the goods because of warpage, and that the material supplied by plaintiff was defective and non-conforming.

Defendant was instructed by plaintiff sometime in March, 1982, to return the material to plaintiff. Subsequently, all but four thousand pounds (4,000 lbs.) of the material supplied by plaintiff was returned to plaintiff by defendant in substantially the same condition. Plaintiff was unable to furnish Noryl FN 215 from another source. Due to plaintiff's inability to furnish conforming FN 215, defendant purchased forty thousand pounds (40,000 lbs.) of FN 215 from General Electric at forty-two cents (42¢) per pound higher than plaintiff's price. Defendant invested eighty (80) hours of labor at Ten Dollars ($10) per hour to inspect and regrind the non-conforming FN 215 back to its original state to return to plaintiff. The material was reground because it would therefore be cheaper to ship and easier for plaintiff to resell. In addition, plaintiff agreed that it would be better to regrind the material.

■ This lawsuit is governed by Article 2 of the Uniform Commercial Code. The court finds that there was a contract for sale of goods between plaintiff and defendant. Plaintiff agreed to sell to defendant a known quantity of Noryl FN 215. It is undisputed that Noryl FN 215 does not warp at one hundred fifty degrees (150°), and it is undisputed that parts made from the Noryl FN 215 supplied by plaintiff did warp when exposed to temperatures of one hundred fifty degrees (150°). Therefore, we find that the goods tendered by plaintiff failed to conform to the contract. Pursuant to Okla.Stat. 12A, § 2–601, if goods fail in any respect to conform to a contract, the buyer may reject all of them or accept all of them.

■ Acceptance of goods occurs when the buyer, after a reasonable opportunity to inspect them, signifies to the seller that the goods are conforming or that he will take them despite their non-conformity, or where the buyer fails to make an effective rejection, or does any act inconsistent with the seller's ownership. Okla.Stat. 12A, § 2–606(1). A buyer is deemed to have accepted goods when, without making any effort to reject them, he receives the goods,

processes them, and sells the finished product to a third-person. *A & G Construction Co., Inc. v. Reid Brothers Logging Co., Inc.,* 547 P.2d 1207 (Alaska 1976). Such actions on the part of the buyer are clearly inconsistent with ownership by the seller. Anderson, *Uniform Commercial Code,* § 2–606:31 (1971). The court finds defendant accepted the goods.

■ A buyer must pay at the contract rate for any goods he has accepted. Okla. Stat. 12A, § 2–607(1). However, a buyer may revoke his acceptance of goods whose non-conformity substantially impairs their value to him if he has accepted those goods without discovery of the non-conformity where his acceptance was reasonably induced by the difficulty of discovery before acceptance. Okla.Stat. 12A, § 2–608(1)(b). As a condition precedent to revoking acceptance, the buyer must show that the goods are both non-conforming and that the non-conformance substantially impairs the value of the goods to the buyer.

Goods are "conforming" when they are in accordance with the obligations under the contract. Okla.Stat. 12A, § 2–106(2). The Noryl FN 215 in issue in this case was not conforming because it would not tolerate the temperature that Noryl FN 215 is specifically able to tolerate.

■ The test for whether the non-conformity substantially impairs the value of the goods to the buyer is whether the non-conformity is such as will in fact cause a substantial impairment of the value to the buyer even though the seller had no advance knowledge as to the buyer's particular circumstances. Okla.Stat. 12A, § 2–608, Official Code Comment 2. The court finds that the non-conformity substantially impaired the value of the Noryl FN 215 to the buyer, plaintiff Atlan. FN 215 is primarily used to make computer cabinets and to house office machines. The plastic, when molded, is a dull, off-white or a dull, grey color. It is virtually always painted a more pleasant color before it is sold to its ultimate user. Noryl FN 215 does not have any other reasonable use. The Noryl FN 215 in question, when painted, could not withstand the temperatures in a drying oven. Therefore, the parts could not be painted and dried in the ordinary manner. If the parts could not be painted, they could not be used in the computer and office machinery industry. They were, therefore, substantially without value to the ultimate user and to the molder who had manufactured them. Therefore, the value of this particular Noryl FN 215 was substantially impaired because it did not conform to the characteristics inherent in normal Noryl FN 215.

■ If the buyer did not know of the non-conformity when he accepted the goods, he must show his acceptance was reasonably induced by the difficulty of discovering the non-conformity before acceptance. The undisputed testimony revealed that in the plastics industry it is common for a molder to test samples only to see whether or not they will mold well. The Noryl FN 215 in question was so tested and did mold well. Plaintiff contends that the defendant was under an additional duty to forward samples he had molded to his customer, MPI, to see whether or not the molded samples would conform to MPI's specifications. While this might be a reasonable provision to place in a contract for sale between plaintiff and defendant, the court finds that the law does not require the buyer to perform any more tests than are common in the industry. Okla.Stat. 12A, § 1–205(2).

■ Revocation of acceptance must occur within a reasonable time after the buyer discovers the non-conformity. There is no claim in this case that defendant unreasonably delayed notifying plaintiff of the non-conformity, and the court finds that plaintiff was notified within a reasonable time after defendant discovered the warping problem.

■ A buyer who revokes acceptance has the same rights with regard to the goods involved as if he had rejected them. Okla.Stat. 12A, § 2–608(3). "Rights" includes remedies. Okla.Stat. 12A, § 1–201(36). A buyer who has rightfully reject-

ed goods has no further obligation in regard to those goods, including an obligation to pay their purchase price. Okla.Stat. 12A, § 2–602(2)(c). Therefore, the court finds against plaintiff on his complaint for the purchase price of the Noryl FN 215 involved in this lawsuit, and now turns to the question of defendant's remedies for rejection of non-conforming goods.

■ Defendant has made a claim for breach of implied warranty of merchantability in regard to the Noryl FN 215 sold by plaintiff. The court finds that defendant did not carry his burden of proof as to damages for breach of warranty. Okla. Stat. 12A, § 2–714(2) provides:

> "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

There was no evidence in this case as to the value of Noryl FN 215 at the time and place of acceptance.

■ The court finds that defendant justifiably revoked acceptance of the defective and non-conforming Noryl FN 215 within a reasonable time after defendant discovered the grounds therefore. Okla.Stat. 12A, § 2–608. Where a buyer justifiably revokes acceptance, he may cancel the contract, and, in addition to recovering so much of the price which he has already paid, may "cover" and have damages for the difference between the contract price and the "cover" price, as well as any incidental or consequential damages. Okla.Stat. 12A, §§ 2–711 and 2–712. As to the first element of damages, defendant paid plaintiff Seven Hundred Ninety-Four and 75/100 Dollars ($794.75) for the Noryl FN 215 shipped as a sample for the molding test. The court finds defendant is entitled to a refund of this sum. Okla.Stat. 12A, § 2–711(1).

■ "Cover" involves the reasonable purchase of goods in substitution for those due from the seller. As damages, the aggrieved buyer may recover the difference between the cost of "cover" and the contract price. When it became apparent that plaintiff could not supply defendant with substitute Noryl FN 215 from another source, plaintiff entered the open market and bought substitute Noryl FN 215 from the General Electric Company at forty-two cents (42¢) per pound higher than plaintiff's price. Although defendant claims that plaintiff shipped twenty-seven thousand two hundred forty-five pounds (27,245 lbs.) of defective Noryl FN 215, defendant only proved that it received twenty-three thousand eighty pounds (23,080 lbs.) of the defective material. The difference between the cost of "cover" and the contract price is forty-two cents (42¢) per pound. Taking the lower figure as the quantity of defective Noryl FN 215 actually shipped by plaintiff and received by defendant, the court finds defendant's damage for "cover" to be Nine Thousand Six Hundred Ninety-Three and 60/100 Dollars ($9,693.60).

Defendant is also entitled to any incidental or consequential damages. Okla.Stat. 12A, § 2–712(2). Incidental damages are defined by Okla.Stat. 12A, § 2–715(1) to include:

> ". . . expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover, and any other reasonable expense incident to the delay or other breach."

■ Official Code Comment 1 to this section provides that it is intended to provide reimbursement to the buyer who incurs reasonable expenses in connection with the handling of rightfully rejected goods or goods whose acceptance may be justifiably revoked or in connection with effecting cover where the breach of contract lies in non-conformity. In this regard, we find that defendant invested eighty (80) hours of labor at Ten Dollars ($10) per hour to inspect and grind the non-conforming material back to its original state to return to

plaintiff. The court therefore finds that defendant should recover the sum of Eight Hundred Dollars ($800) for this incidental expense.

▮▮▮▮ Defendant is also entitled to consequential damages including any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not be reasonably prevented by cover or otherwise. Okla.Stat. 12A, § 2–715(2)(a). Consequential damages must be foreseeable. *Id.; Hadley v. Baxendale,* 156 English Reporter 145 (ex. 1854). A seller is liable for all damages resulting from his breach if they arise from circumstances that the seller knew about or had reason to know about, even if he did not consciously assume the risk of such liability. White & Summers, *Uniform Commercial Code,* § 10–4 at p. 396. Consequential damages must be certain; that is, they must be proved with reasonable certainty. However, consequential damages may be determined in any manner which is reasonable under the circumstances. Okla.Stat. 12A, § 2–715, Official Code Comments 4 and 5.

Defendant seeks to recover consequential damages for the wasted labor which went into producing ten thousand two hundred fifty-eight (10,258) parts from non-conforming Noryl FN 215. Defendant manufactured this quantity of parts, discovered that they were made of non-conforming material which would warp when painted by its customer, took back the product, obtained Noryl FN 215 from another source, molded an equal quantity of computer parts from the new source of Noryl FN 215, and sent the new parts on to its customer. It cost defendant Five and 14/100 Dollars ($5.14) per part for labor to manufacture each part. The first time these parts were molded, this was all wasted labor, because the parts, when manufactured, were useless to both defendant and its customer because of the warping problem.

▮▮▮▮ The court finds that this loss was proved to be reasonably foreseeable. Plaintiff, the seller, could have reasonably foreseen at the time of sale that defendant

would go forward and mold the entire shipment of Noryl FN 215 into computer parts for its customer. Defendant proved its labor costs per part with reasonable certainty at trial. Finally, defendant could not reasonably have prevented this loss by cover or otherwise. Plaintiff suggests that defendant should have molded a "trial run" of parts from the Noryl FN 215, shipped them to its customer, and waited for its customer's comments before completely molding all of the plastic which plaintiff had shipped to defendant. While this might have been a reasonable provision to include in the contract for sale, the court finds that the law does not require this buyer to do what plaintiff suggests. The court therefore finds that defendant is entitled to Five and 14/100 Dollars ($5.14) per part for wasted labor as consequential damages under Okla. Stat. 12A, § 2–715(2)(a). A total of ten thousand two hundred fifty-eight (10,258) parts were made from the non-conforming Noryl FN 215; therefore, defendant's consequential damages are Fifty-Two Thousand Seven Hundred Twenty-Six and 12/100 Dollars ($52,726.12).

▮▮▮▮ Defendant makes a claim for consequential damages to represent the loss of expected profit on each part made of non-conforming Noryl FN 215, and a measure of damages for the loss it suffered by finally selling each part to its customer at seventeen cents (17¢) below cost. Both of these items constitute lost profits to defendant. Defendant expected to make a profit of seventy-eight cents (78¢) per part, but at the close of the entire scenario, defendant ended up losing seventeen cents (17¢) per part on the contract with its customer. The testimony, however, did not reveal that this loss in profits was proximately caused by plaintiff's shipment of non-conforming Noryl FN 215.

Defendant testified that he molded a total of ten thousand two hundred fifty-eight (10,258) parts from defective and non-conforming material at a cost of One and 91/100 Dollars ($1.91) per part. The testimony was uncontroverted that the replacement material obtained from General Elec-

tric was molded at a cost of Two and 86/100 Dollars ($2.86) per part for material. The replacement material obtained from General Electric cost forty-two cents (42¢) per pound more than the Noryl FN 215 obtained from plaintiff. It would be sheer speculation on the part of the court to determine how much of this increase in cost per part was due to the cover price, for which defendant has already been awarded a substantial sum, and how much was attributable to other consequences of plaintiff's breach of sales contract. Were the court to award defendant a recovery for lost profits on the present state of the record, defendant would enjoy a double recovery in this case. To the extent that defendant lost profits on its contract with its customer, the court finds that the lost profits were solely due to the increased cost for Noryl FN 215 from General Electric. The court therefore will not make an award for lost profits on the grounds that lost profits were not proved with reasonable certainty.

IT IS BY THE COURT THEREFORE ORDERED that plaintiff take nothing of defendant on plaintiff's complaint. IT IS FURTHER ORDERED that judgment be entered in favor of defendant and against plaintiff on defendant's counterclaim in the sum of Sixty-Four Thousand Fourteen and 47/100 Dollars ($64,014.47). IT IS FURTHER ORDERED that costs are assessed against plaintiff.