GREAT DIVIDE INSURANCE COMPANY, Appellant/Cross-Appellee,

v.

Raymond CARPENTER, a minor, through his natural mother, Dorothy REED, Appellees/Cross-Appellants.

Nos. S-9774, S-9843.

Supreme Court of Alaska.

Oct. 24, 2003.

Paul D. Stockler, Anchorage, and William R. Hickman, Earl M. Sutherland, Reed McClure, Seattle, Washington, for Appellant/Cross–Appellee.

Mark Clayton Choate, Wailuku, Maui, Hawai'i, for Appellees/Cross–Appellants.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

PER CURIAM.

A jury awarded compensatory damages of $1,540,000 and punitive damages of $2,600,000 against Great Divide Insurance Company on claims that it had breached its duties to its insured, Gowdy & Son, while defending a claim brought by Raymond Car-

penter. The five main issues presented in the appeal are:

1. Did the policy issued by Great Divide to Gowdy & Son cover the accident that resulted in injury to Carpenter?

2. Was the jury determination that Great Divide did not fulfill its legal obligations to Gowdy & Son in accord with the law?

3. Was the jury determination that Great Divide did not fulfill its legal obligations to Gowdy & Son supported by the evidence?

4. Should the issue of punitive damages have been submitted to the jury?

5. Was the jury award of punitive damages supported by the evidence?

Carpenter has cross-appealed, raising the question whether the superior court erred in refusing to rule as a matter of law that Great Divide was bound by the arbitration-based compensatory damage judgment of more than $2,000,000 entered in *Carpenter v. Gowdy*.[1]

We conclude that the policy covered the accident, that the finding of a breach was legally justified, that there was sufficient evidence that Great Divide breached its defense duties, but that the claim for punitive damages should not have been submitted to the jury because there was no pretrial notice of this claim. Our decision on this issue moots consideration of the fifth issue as to whether the jury award of punitive damages was supported by the evidence. We also conclude that the court properly ruled that Great Divide was not bound by the judgment in *Carpenter v. Gowdy*. We thus affirm the award of compensatory damages and reverse the award of punitive damages.

## I. FACTS AND PROCEEDINGS

### A. The Underlying Accident and Coverage

Elmer and Dan Gowdy, d/b/a Gowdy & Son, operated a floor-covering business in Douglas. The business was operated out of Elmer's house that was heated in part by woodstoves. On September 3, 1993, Rick Ostman, a sometime employee of Gowdy & Son, was felling dead trees on the property of John Vavalis in order to obtain firewood to heat Elmer's house. Raymond Carpenter, age eleven, was struck by a falling tree cut by Ostman. He suffered serious, permanent injuries, including brain damage. On the day of the accident, a Sunday, Dan Gowdy was also on the Vavalis property skidding logs that Vavalis had sawn to Vavalis's new portable mill. Dan was working without remuneration to help Vavalis as "the neighborly thing to do." Elmer Gowdy was also on the Vavalis property "off and on" on the day of the accident. He had directed Ostman to go to the property to cut three dead spruce trees for firewood. Ostman's trial testimony as to whether Elmer or Dan had told him what trees to cut is unclear. Initially he said Elmer told him, then that he could not remember if it was Dan or Elmer, and then that Dan did so. Ostman testified that he was being supervised by Dan at the Vavalis property.

At the time of the accident Gowdy & Son was insured by Great Divide under a commercial general liability policy with an "each occurrence" limit of $1,000,000. In the policy declarations sheet Gowdy & Son was described as a partnership whose business was "floor-covering installation." Its only relevant premium classification was "floor-covering installation—not ceramic, tile or stone." The policy contained a classification limitation stating that "[t]his insurance does not apply to 'bodily injury' ... for operations which are not classified or shown on the ... Declarations, its endorsements or supplements."

### B. *Carpenter v. Gowdy*

Carpenter sued Dan Gowdy, but not Elmer Gowdy or Gowdy & Son, on February 3, 1995, claiming that the tree that injured him was negligently felled. Carpenter contended that Dan Gowdy was directly and vicariously responsible for this negligence; directly for failing to exercise adequate supervision and vicariously under principles of respondeat superior. The complaint alleged that Dan Gowdy "operated a business in Juneau generally engaged in the operation of the felling

1. No. 1JU–95–245 Civil (Alaska Super, 1st Dist.).

of trees," and that at the time of the accident Dan was cutting trees on the property at the request of John Vavalis.

When Dan was served with the complaint, he took it to attorney Jim Bradley, a family friend. Bradley gave some advice to Dan and attended a deposition with him, but did not enter an appearance. On August 21, 1995, Bradley wrote a letter for Dan's signature tendering the defense to Great Divide. Upon receiving this letter Great Divide assigned adjuster Greg Anson, whose office was in Arizona, to handle the claim. On August 25, 1995, Anson read the complaint and the policy and identified a potential coverage question based on the classification limitation. He called Anchorage attorney Patrick McKay, who had previously represented Great Divide in numerous cases. According to Anson's contemporaneous notes, McKay told him that the classification limitation would be upheld. The notes also stated that Great Divide should assign attorney Paul Stockler to file a declaratory judgment action on coverage.

On August 28, 1995, Anson had a telephone conversation with Dan Gowdy. Anson, again according to his notes, advised Dan that a coverage question existed under the classification exclusion and that Great Divide would conduct a defense under a reservation of rights. Anson's notes indicate that Dan said he had nothing to do with cutting trees on the property, that he was operating a skidder at the time of the accident, and that he and his father were hired by the property owner to remove felled trees. Dan also told Anson that his deposition had already partly been taken and was slated to continue on that day, and that he was not currently represented by counsel. Anson called McKay, who was able to cancel the deposition.

On August 31, 1995, Anson wrote both Elmer and Dan Gowdy. He acknowledged receipt of the *Carpenter* complaint and stated that according to the complaint "Dan Gowdy was conducting a tree-clearing operation" at the time of the accident. Anson stated that he had assigned Pat McKay to defend the Gowdys but that the defense would be "under a full reservation of rights" and that the defense would not "constitute either an ad-

mission of coverage under the policy, or an acknowledgment of any responsibility to pay damages in any judgment against you by Raymond Carpenter." The letter went on to observe that the limits of liability under the policy were $300,000 per occurrence. Relying on the classification limitation exclusion, the letter stated:

> Clearly, the pleadings contained in the lawsuit indicate that injury sustained by the plaintiff were [sic] as a result of your conducting a tree clearing operation and is not in any way related to the business description of your policy. Therefore, if it is determined that there would be no liability coverage available to your [sic] under the above policy, I encourage you to seek and obtain counsel at your own choosing and expense to defend your interests in this matter.

Anson's letter concluded: "If you feel I have overlooked an allegation in the complaint which would be covered under your policy, or potentially covered under your policy, please point out such language to me and I will be happy to reconsider our position."

McKay appeared in the case as counsel for Dan Gowdy and conducted the defense on his behalf. Soon after McKay assumed the defense, Dan was interviewed in person by Mike Trevethan, an independent adjuster hired by Great Divide. Trevethan asked questions that were relevant to liability and coverage issues. In the process of conducting the defense McKay took and participated in a number of depositions and forwarded reports of the depositions to Great Divide. Whether McKay's questions during the depositions were designed to elicit facts showing no coverage rather than no liability is a disputed issue in the current litigation.

In December 1995 McKay, acting on behalf of Dan, filed a third-party claim against Rick Ostman and John Vavalis, claiming that their negligence had contributed to the accident. In early January 1996 Carpenter filed an amended complaint adding Elmer Gowdy as a defendant. Elmer's attorney, Loren Domke, wrote Great Divide and asked that he be appointed as Elmer's lawyer to defend the case at Great Divide's expense. Great Divide agreed and thereafter McKay and

Domke cooperated in conducting the defense of the Carpenter action.

The case was set for trial to begin in June 1996. At a mediation conference held in April 1996, Carpenter and the Gowdys agreed to a procedure by which the case would be settled. Contingent on the outcome of an arbitration proceeding, the Gowdys agreed to confess judgment and assign to Carpenter any rights or claims that they had against Great Divide arising out of Great Divide's conduct of their defense. In exchange Carpenter agreed not to execute on the other assets of the Gowdys. The arbitrator would determine whether the Gowdys were legally responsible for Carpenter's injuries and would determine Carpenter's damages. No fault would be apportioned to Vavalis, Ostman, or Raymond Carpenter. The arbitrator would be selected by Carpenter's counsel. Great Divide was aware of the settlement procedures but did not agree to the settlement or participate in the arbitration called for by the settlement. On July 27, 1998, the arbitrator found that the Gowdys were liable and awarded Carpenter damages of $2,006,000. A judgment was entered in accordance with the arbitration award.

### C. *Great Divide v. Carpenter*

Great Divide's present action against both Gowdys and Carpenter was filed on May 28, 1996, seeking a declaration that there was no coverage because of the classification limitation exclusion. Carpenter answered in his own right and as the assignee of the Gowdys, generally denying that the claims were excluded from coverage. He also asserted a counterclaim that alleged that Great Divide, upon being notified of the Carpenter claim "which on its face was possibly covered by the policy, ... reserved the right to deny coverage, failed to retain independent counsel for Dan Gowdy and failed to obtain independent counsel for Elmer Gowdy until after he had been prejudiced by the absence of

counsel." This was alleged to be a breach of the policy and the implied covenant of good faith and fair dealing and to preclude by estoppel Great Divide from denying coverage. Carpenter sought compensatory but not punitive damages.

Great Divide answered the counterclaim denying that Carpenter was entitled to any relief. After discovery and pretrial proceedings Great Divide sought to limit the claims at trial, arguing that Carpenter had abandoned his claim that there was coverage based on comments in his initial disclosure statement. The court denied this motion, ruling that the central issue in the declaratory judgment case "is whether there is coverage."

The trial began on August 16, 1999. Carpenter's counsel first mentioned punitive damages after the jury had been selected. Great Divide's counsel objected that punitive damages had not been pled and noted that he would oppose any motion to amend the counterclaim to add punitive damages. Counsel also sought a protective order barring any reference to punitive damages. The court initially ordered Carpenter's counsel not to refer to punitive damages in his opening statement. But at the close of the evidence the court ruled that it would give an instruction on punitive damages.

At the trial both sides agreed that Anson had erred in advising Dan in the August 31, 1995 letter that counsel of Dan's own choosing in the defense of the Carpenter suit would have to be paid for by Dan.[2] Alaska decision and statutory law require an insurance company to provide independent counsel selected by the insured at the company's expense in cases where the company defends under a reservation of rights.[3] The significance of this mistake was disputed. Also at issue was the broader question of whether the conduct of the defense by Great Divide and McKay was appropriate.

---

**2.** The parties also agreed that Anson erroneously stated that the policy limits were $300,000 rather than $1,000,000. Great Divide's current adjuster on the case testified that the policy was initially written with $300,000 limits, but they were later raised to $1,000,000. She stated that this was the source of Anson's mistake and that she corrected it in a letter to the Gowdys that she sent in June 1996 after she took over the case.

**3.** *CHI of Alaska, Inc. v. Employers Reinsurance Corp.*, 844 P.2d 1113 (Alaska 1993); AS 21.89.100 (originally enacted effective July 1, 1995), ch. 62, § 107, SLA 1995.

Great Divide's expert witness, attorney Michael Geraghty, testified that McKay's conduct was appropriate and that "if anything, [he] bent over backwards to protect his client, who was Dan Gowdy, and, really, to the prejudice of the insurance company...." Geraghty also testified that Anson's failure to advise Dan Gowdy that he could select his own defense counsel, who would be paid by Great Divide, had no impact on the defense of the case in light of the effective representation provided by McKay. Carpenter's expert witness, John Partlow, an insurance claims supervisor, testified that Great Divide should have conducted an investigation designed to find coverage. Instead, Anson made an initial decision that there was no coverage, and thereafter Great Divide showed no inclination to re-examine that decision. Partlow stated that this "borders on unconscionable." Partlow also opined that McKay had a duty to try to develop facts that would support coverage.

Anson, McKay, and Dan Gowdy also testified concerning their respective activities in connection with the Carpenter case. Anson, who no longer worked for Great Divide, described what he remembered about his conduct pertaining to the case. McKay testified that he believed that his role was to defend Dan Gowdy in the Carpenter case, not to become involved in coverage issues. He testified that his deposition questions were designed to lead to the exoneration of Dan. Dan Gowdy testified that despite the letter to Great Divide that Bradley drafted and he signed claiming coverage and requesting a defense, he did not believe the accident was covered by the policy. He also testified that after the first few conversations he had with McKay, McKay told him that he could pick his own lawyer. Bradley later told him the same thing. But Dan did not testify that either McKay or Bradley told him that the lawyer he chose would be paid for by Great Divide. Both Gowdy and Bradley were satisfied with McKay throughout the defense of the Carpenter case.

At the close of the evidence Great Divide moved for a directed verdict on the question of policy coverage. The court reserved judgment until after the return of the verdict. When the verdict was returned, the court denied the motion and affirmatively ruled that there was coverage.

The jury returned a special verdict that concluded that Great Divide did not fulfill its duties to the Gowdys and assessed compensatory damages of $1,540,000.[4] The jury also found that McKay did not fulfill his obligations to Dan Gowdy and that Great Divide had been shown by clear and convincing evidence to have been reckless and indifferent to the rights of the Gowdys and deserved punishment. In subsequent bifurcated proceedings the jury concluded that punitive damages of $2,600,000 should be awarded against Great Divide.

Following post-judgment motions the trial court entered judgment against Great Divide in favor of Carpenter for $1,540,000 plus interest from August 27, 1999, and punitive damages of $2,600,000 plus interest from the date of judgment. Great Divide appeals and Carpenter cross-appeals.

## II. DISCUSSION

### A. The Accident Was Covered by the Policy.

Great Divide argues that the superior court should have granted its motion for a directed verdict declaring that its policy did not cover the accident. It contends that the classification limitation excludes coverage. Great Divide also argues that the superior court erred in acting as the trier of fact on coverage issues and that the question of coverage should have been submitted to the jury.

The business description of Gowdy & Son contained in the declarations sheet of the policy was "floor-covering installation," and the relevant classification for premium purposes was the same. The classification exclusion provided that "[t]his insurance does not apply to 'bodily injury' ... for operations

---

4. In answer to a later interrogatory from the court the jury explained that the award consisted of $1,000,000 as the amount of the policy's cov-

erage, prejudgment interest of $538,014, and $1,086 representing premiums paid by the Gowdys.

which are not classified or shown on the ... Declarations, its endorsements or supplements."

Great Divide argues that felling the tree that injured Carpenter was an "operation" within the meaning of the classification exclusion, and since tree felling was not listed in the declarations, there was no coverage. Carpenter argues that the tree felling was an incidental activity that supported the floor-covering operation. The trial court accepted Carpenter's view, noting testimony that Elmer Gowdy burned three to four cords of wood each winter as "supplemental heat for the business/residence." The court ruled that the connection between the cutting of the tree and the business was "not strong" but sufficient, stating:

the fact that there was firewood that was going to the place where the business worked out of, I believe it was not prohibited under the policy. And given the benefits that the business got out of this, and the operations, that I believe there was coverage.

I looked at the jury verdict as an advisory opinion as to what they thought on the issue. But I believe that there was coverage, and I will deny the motion and find coverage.

We interpret insurance policies in accordance with the following principles:

To the extent that there are no relevant unresolved or controversial facts, the construction of an insurance contract is a matter for the court. A policy's meaning is determined by examining the language of the disputed policy provisions, the language of other provisions in the policy, relevant extrinsic evidence, and case law interpreting similar provisions. An insur-

ance policy may be considered a contract of adhesion and as such should be construed so as to provide the coverage which a layman would reasonably have expected, given his lay interpretation of the policy language. We therefore resolve ambiguities in the meaning of insurance contracts against the insurer.[5]

We agree with Carpenter and the superior court that activities that merely support a classified business are covered under policies like the one presently before us. Businesses necessarily engage in much conduct that is incidental to and supportive of revenue-earning operations. Businesses must, for example, acquire supplies, equipment and fuel, pay bills, bank, repair what they use, and send their employees on countless errands in support of operations. Where a business heats its premises by wood, cutting dead trees for firewood can reasonably be viewed as an incidental support activity.[6]

The result would be different if, as alleged in Carpenter's initial complaint, the Gowdys were in the business of cutting trees and the tree that injured Carpenter had been cut in the course of that business. In that case tree felling would be a revenue-earning activity and thus an "operation," as used in the classification exclusion, and coverage would be excluded.[7]

■■■ Great Divide's second contention concerning coverage is that the court invaded the province of the jury in determining coverage. This argument is inconsistent with Great Divide's position before the trial court. During the course of discussing instructions the court asked what issues the jury should decide and what issues the court should decide. Counsel for Great Divide stated that

5. *Fejes v. Alaska Ins. Co.*, 984 P.2d 519, 522 (Alaska 1999) (citations omitted).

6. Carpenter's counsel offered an apt hypothetical illustration of a business that heated its premises with fuel oil, positing a case where an employee bought a barrel of oil and handled it in a manner that injured a third party. In such a case, he argued, it would be unreasonable to contend that buying and handling the oil was a separate "operation," as distinct from an activity in support of the classified operation.

7. In the two cases that Great Divide has cited in which courts upheld classification limitations exclusions, the "operations" that were excluded were not merely incidental to the classified business; rather they were separate sources of revenue. The cases are distinguishable on this basis. The cases are *Mt. Vernon Fire Ins. Co. v. Chios Constr. Corp.*, 1996 WL 15668 (S.D.N.Y.1996) (iron work a separate classification from "carpentry-interior"); *Ruiz v. State Wide Insulation & Constr. Corp.*, 269 A.D.2d 518, 703 N.Y.S.2d 257 (N.Y.App.Div.2000) (roof repair an operation separate from "painting").

the Court has to decide whether or not there's coverage.... If the Court decides that there is no coverage ... the court should dismiss the jury and the case is dismissed. If the judge—if Your Honor decides there is coverage, then the jury has these four questions to decide that I've ... laid out in my verdict form.

Great Divide is precluded from now taking a position inconsistent with the position it took at trial.

Further, only one special verdict question was asked relevant to coverage, namely whether the accident occurred "during the course and scope of business of Elmer & Dan Gowdy, d/b/a Gowdy & Son?" The jury answered "yes." The court considered this answer to be advisory only, but reached the same conclusion. Great Divide did not request any other jury instructions or special verdict questions pertaining to coverage, nor does it now contend that any other facts were disputed. Under these circumstances the meaning of the policy was properly a matter for the court.[8]

### B. The Jury Determination that Great Divide Did Not Fulfill Its Defense Obligations Was Not Legally or Factually Erroneous.

In the special verdict the jury was asked: "Did Great Divide fulfill its obligation to Dan and Elmer Gowdy under the contract of insurance in accord with the law?" The jury answered "no" to this question. Great Divide challenges this finding with a number of legal arguments and one factual argument confusingly grouped together under a section of its brief captioned "The Jury Verdict Finding Bad Faith Is Not Supported by the Evidence." In order to understand these arguments, the jury instructions on Great Divide's duties must be described.

The court began by instructing on the obligations of an attorney appointed by an insurance company to defend its insured when coverage is disputed. The court explained the duties of appointed counsel and particularized them to the facts of the case as follows:

Meanwhile, the attorney hired by the insurance company to defend the insured must zealously represent the interests of the insured, not the insurance company. He may, indeed must send progress reports to the insurance company telling it how the case is going. But he must not use his relationship with the insured, his client, to improperly give advantage to the insurance company in its coverage dispute with the insured.

In this case you must determine whether it is more likely than not that Patrick McKay failed in his obligation to represent his client by improperly providing coverage information to Great Divide, or taking other actions.

The court then addressed in particular and general form the defense obligations of an insurance company:

In every insurance policy, there is an implied obligation of good faith and fair dealing on the part of both parties. Raymond Carpenter also alleges that Great Divide Insurance Company breached the covenant of good faith and fair dealing in other ways, including that it did not properly and fully investigate the claim before deciding to file a declaratory judgment action; that Great Divide did not affirmatively look for coverage to protect the insured; and that Great Divide did not inform the insured of the correct amounts of liability coverage provided by the policy; and that Great Divide incorrectly told the insureds that they would have to pay for their own counsel to protect their interests. If you find that any of the above occurred, you must determine if it is more probable than not that Great Divide breached the covenant of good faith and fair dealing.

An insurance company which fails to deal fairly and in good faith with its insured by refusing unreasonably to pay the insured for a valid claim covered by the policy is liable for all damages resulting from such conduct. The duty to defend arises if the complaint, on its face, alleges facts which, standing alone, give rise to a possible finding of liability covered by the

---

8. *See Fejes,* 984 P.2d at 522.

policy; or, if the complaint does not contain such allegations, where the true facts are within or potentially within the policy coverage, and are known or reasonably ascertainable to the insured [sic].

When investigating a claim, an insurance company has a duty to diligently search for evidence which supports its insured's claim. If it seeks to discover the evidence that defeats the claim, it holds its interests above that of its insured.

Great Divide does not argue that these instructions misstate the law, nor does it contend that it is not vicariously liable, as the instructions assume, for any dereliction of its appointed counsel, McKay. Thus, for purposes of this case the legal validity of the instructions is assumed.

 We turn now to the various legal arguments that Great Divide presents in its challenge to the jury's verdict that it did not fulfill its defense obligations. Great Divide begins by quoting a treatise to the effect that an insurance company does not breach its policy by unjustifiably reserving its rights to deny coverage.[9] Great Divide does not develop this point further or explain how it relates to the court's instructions. But the point appears to be an oblique attack on the court's instruction that an insurance company has an obligation to diligently seek out evidence that will support coverage. Great Divide may be saying that if an insurance company can with impunity reserve its rights regardless of what a proper investigation might show concerning coverage, then it is

inconsistent to require it to make an investigation seeking out coverage. We doubt that such an argument, if actually made, would have merit. The covenant of good faith and fair dealing governs all aspects of the insurer-insured relationship, and we see no reason to exempt reservation-of-rights decisions. But we need not do more than express skepticism, for the point is not properly before us. It is inadequately briefed; it is also waived because it was not raised below.[10]

 Great Divide's second argument is that since the Gowdys suffered no damages because of the covenant not to execute aspect of their settlement agreement, Great Divide cannot be liable for breach of its defense obligations. This argument lacks merit. Our case law permits an insured whose insurer has committed a material breach of one of its defense obligations to enter into a settlement agreement with the injured claimant.[11] Ordinarily the insured is barred by the cooperation clause of the policy from settling without the insurer's consent. But the prior breach by the insurer precludes it from relying on the cooperation clause as a defense to liability for the settlement.[12] And the insured's settlement may involve an assignment of the insured's right against the insurer to the claimant together with a covenant not to execute against the other assets of the insured.[13]

The covenant not to execute ordinarily means that the insured has not suffered a personal loss. But covenant settlement agreements are given effect because it is

---

**9.** Great Divide quotes ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES § 2.15, at 63 (3d ed.1995), as follows:

Whether or not the coverage defenses specified by the insurance company in its reservations of rights letter are justified should, in most instances, be irrelevant. By reserving its rights, the company is merely putting the insured on notice of those defenses that it believes might ultimately serve to reduce or eliminate its duty to indemnify. That duty, however, has not yet come into existence, since the insured has not yet become legally obligated to pay damages. An unjustified reservation, therefore, cannot constitute a breach of contract.

**10.** Points that are inadequately briefed are considered waived. *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980). Instruc-

tions may not be challenged on appeal on grounds not raised in the trial court in the absence of plain error. *Alaska Marine Pilots v. Hendsch*, 950 P.2d 98, 109–110 (Alaska 1997); *Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 152–53 (Alaska 1992); *see also* Alaska R. Civ. P. 51(a).

**11.** *See Grace v. Ins. Co. of N. America*, 944 P.2d 460 (Alaska 1997); *Washington Ins. Guar. Ass'n v. Ramsey*, 922 P.2d 237, 239, 246–48 (Alaska 1996); *Continental Ins. Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281, 286 (Alaska 1980).

**12.** *Grace*, 944 P.2d at 464, 465 & authorities there cited.

**13.** *See* authorities cited in note 11, *supra*.

thought that an insured that has been placed at economic risk by its insurer's breach should be allowed to protect itself by shifting the risk to the breaching insurer without first subjecting itself to potential financial ruin. As the Supreme Court of Minnesota stated in approving a covenant settlement agreement:

> If as here, the insureds are offered a settlement that effectively relieves them of any personal liability, at a time when their insurance coverage is in doubt, surely it cannot be said that it is not in their best interest to accept the offer. Nor, do we think, can the insurer who is disputing coverage compel the insureds to forgo a settlement which is in their best interest.[14]

▬▬ Covenant settlement agreements are enforceable against an insurance company if the agreements are reasonable. If such agreements were not enforceable, claimants would not make them and insureds would often suffer financial ruin before they could vindicate their rights against their insurers. Affording insurers the right to relitigate liability and damages issues resolved by agreement "would destroy the purpose served by allowing insureds to enter into [covenant settlement] agreements because claimants would never settle with insureds if they never could receive any benefit."[15] But insurers are not precluded from litigating the defenses they relied on in denying coverage, or reserving their rights to disclaim coverage,

or other issues pertaining to whether they have breached their obligations.[16]

Covenant settlement agreements can be abused. The insured who is fortunate enough to be able to make such an agreement has no incentive not to agree to very high damage awards. In recognition of this, we have been careful to hold that an insurance company that has materially breached its defense obligations whose insured has made such an agreement is not automatically bound by the agreement. Instead, the agreement must be reviewed for reasonableness by the trier of fact.[17]

Great Divide's third legal challenge to the jury determination that it violated its defense duties is to suggest that we adopt a recent California case limiting covenant settlement agreements to cases in which the insurer has failed entirely to provide a defense,[18] or a Texas case that ruled that such agreements are void as against public policy.[19]

▬▬ In *Washington Insurance Guaranty Ass'n v. Ramsey*,[20] we rejected the argument that the only defense obligation breach that would justify enforcement of a covenant settlement agreement is an outright refusal to defend. In that case, the insurer defended the action but unreasonably refused to settle within policy limits. The insured then entered into a covenant settlement agreement with the plaintiff. We declined to hold the agreement invalid despite the specific argument that such agreements were only enforceable where there is a refusal to defend. We adhere to our decision in *Ramsey*.[21] The

14. *Miller v. Shugart*, 316 N.W.2d 729, 733–34 (Minn.1982).

15. *United Servs. Auto Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246, 253 (1987).

16. *Grace*, 944 P.2d at 467; *Bayless & Roberts*, 608 P.2d at 288 (accepting argument that insurer "must either (1) affirm the policy, defend the suit, and pay any resulting adverse judgment, thus waiving both the alleged breach by the insured and any possible coverage defenses, or (2) repudiate the policy and withdraw from the defense, taking its chances that its claim of a breach by the insured would stand up in a subsequent suit on the policy.").

17. *Grace*, 944 P.2d at 467–68; *Ramsey*, 922 P.2d at 247–48; *Bayless & Roberts*, 608 P.2d at 293 n. 20. We revisit this subject in our discussion of Carpenter's cross-appeal, *infra*.

18. *Safeco Ins. Co. v. Superior Court*, 71 Cal. App.4th 782, 84 Cal.Rptr.2d 43 (1999).

19. *State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696 (Tex.1996).

20. 922 P.2d 237, 246 (Alaska 1996).

21. In *Bayless & Roberts*, 608 P.2d at 281, the insurer also did not refuse to defend; instead it attempted to defend under a reservation of rights to later disclaim coverage. We held that a covenant settlement agreement was valid where the insured had rejected the conditional tender of defense: "[I]f an insured refuses to accede to the insurer's reservation of rights, the carrier must either accept liability under the policy and defend unconditionally or surrender control of the defense and be held liable if it guessed wrong on the coverage issue." *Id.* at 288. Although *Bay-*

focus of our case law has been on whether the insurer "has materially breached its contractual obligation to the insured."[22] Where such has occurred the insurer cannot escape liability merely because the insured has taken control of the defense and settled the case in a manner that, except for the insurer's material breach, would violate the cooperation clause or other terms of the insurance contract.[23]

With respect to Great Divide's argument that we should adopt the Texas rule holding that covenant settlement agreements are void as against public policy, we disagree. That approach is contrary to our case law and contrary to the decisions of most of the other states whose courts have ruled on the validity of covenant settlement agreements.[24]

In summary, we conclude that the legal challenges presented by Great Divide to the jury's determination that it is liable for failing to fulfill its defense obligations do not require reversal of the judgment.

■■■ Great Divide raises only one factual argument challenging the sufficiency of the evidence to support the jury's verdict. The argument is that Great Divide's failure to advise Dan Gowdy that it would pay for independent counsel selected by Dan was a mere technical violation of its defense duties. We discuss and reject this argument in the following paragraphs.

Great Divide argues that its failure to advise Dan Gowdy that it would pay for independent counsel selected by Dan was an inconsequential failure because at some fairly early time McKay and Bradley advised Gowdy of his *CHI* rights.[25] But while there is uncontradicted testimony that Dan Gowdy was told that he could select his own counsel, it is not clear that he was ever told that counsel of his selection would be paid by Great Divide. Even at trial he seemed not to understand this point.

We reject Great Divide's contention that failure to advise Dan Gowdy of his *CHI* rights was necessarily inconsequential. Independent counsel of Gowdy's choosing might have developed the theory of coverage which the trial court, and this court, accepted: that felling the tree for firewood to heat the business was incidental to the classified business and not a separate operation. If this had been done, Anson, who invited the presentation of overlooked theories of coverage in his August 31, 1995 letter, might have reconsidered his position on coverage. This could have greatly changed prospects for a settlement between Carpenter and Great Divide. Another possibility is that Great Divide might have chosen to defend without a reservation of rights in order to maintain control of the defense. Of course these are merely possibilities. But we held in *Lloyd's v. Fulton* that an insurer's breach of its duty to provide a conflict free defense "must be considered a material breach ... unless the breach clearly has no adverse impact on the relationship between the insurer and the insured."[26] In the present case Anson's failure to advise Dan Gowdy of his *CHI* rights was not clearly without adverse impact, and thus properly can be considered a material breach.

Finally, we also observe that the jury was instructed on other theories under which it could find that Great Divide breached its defense obligations. The sufficiency of the evidence to support a compensatory damage award under these theories has not been challenged. Thus Great Divide's claim that

less & Roberts was a policy defense case rather than a coverage defense case, in *CHI of Alaska, Inc. v. Employers Reinsurance Corp.*, 844 P.2d 1113 (Alaska 1993), we adopted the rule of decision of *Bayless & Roberts* in the context of a coverage defense. We note also that cases in other jurisdictions have given effect to covenant settlement agreements where the insurer offered a defense but did not accept responsibility to pay the insured's liability exposure. *See, e.g., Miller v. Shugart*, 316 N.W.2d 729 (Minn.1982); *United Servs. Auto. Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987).

**22.** *Grace*, 944 P.2d at 464–65 & cases there cited.

**23.** *Id.*

**24.** *See,* Justin A. Harris, *Judicial Approaches to Stipulated Judgments, Assignments of Rights, and Covenants Not To Execute in Insurance Litigation,* 47 Drake L.Rev. 853 n.31 & accompanying text.

**25.** *See supra* note 2 and accompanying text.

**26.** 2 P.3d 1199, 1209 (Alaska 2000).

the verdict concerning its breach of its defense obligations is factually unsupported fails.

### C. The Issue of Punitive Damages Should Not Have Been Submitted To the Jury.

■ We turn now to Great Divide's contention that punitive damages should not have been submitted to the jury because the claim for punitive damages was not pled and no notice of such a claim was given prior to trial.

Carpenter's counterclaim alleged that Great Divide reserved the right to deny coverage, failed to retain independent counsel for Dan Gowdy, failed to obtain independent counsel for Elmer Gowdy until after he had been prejudiced by the absence of counsel, and failed to obtain a written waiver of the right to independent counsel from Dan Gowdy. The counterclaim alleged that this conduct "constituted a breach of the insurance contract, a violation of the implied covenant of good faith and fair dealing and a violation of Alaska law in effect at the time of plaintiff's conduct." The counterclaim went on to allege that the Gowdys were prejudiced by this conduct and that as a consequence of this conduct Great Divide "is estopped from denying coverage under the contract of insurance and is liable to Raymond Carpenter, Gowdy's assignee, for the full amount of any liability the Gowdys incur as a result of the injuries suffered by Raymond Carpenter on September 3, 1993." In the wherefore clause of the counterclaim, judgment was sought by Carpenter "[a]s and for his special and general damages, an amount to be determined at trial;" plus interest, costs and fees and "[s]uch other and further relief as the court may grant in equity."

A scheduling order of December 30, 1998, required the parties to file proposed jury instructions in advance of trial. Carpenter filed proposed instructions on July 14, 1999, a month before the trial began. No jury instructions on punitive damages were included.

The first indication by Carpenter that he sought punitive damages occurred in comments his counsel made to the trial court on the first day of trial. Great Divide immediately objected on the ground that punitive damages had not been pled and asked for a protective order preventing any reference to punitive damages during the course of the trial. The court initially barred reference to punitive damages. On the second day of trial the court ruled that it would not bar Carpenter from "exploring those avenues that you believe will sustain a punitive damages claim," while indicating that it would decide later whether punitive damages would be submitted to the jury. Ultimately the court instructed the jury on punitive damages.

Pleadings provide an opposing party with notice of the nature of claims being asserted.[27] The Alaska Rules of Civil Procedure require a party who seeks special damages to specifically state this in a pleading.[28] But the rules do not require that punitive damages be specifically pled.

Some jurisdictions have ruled on the question whether a litigant must include a reference to punitive damages in pleadings. The North Carolina Supreme Court has held that a plaintiff need not explicitly plead punitive damages in order to recover them, though the pleading must "fairly apprise[ ] opposing parties of facts which will support an award of punitive damages...."[29] The Oregon Supreme Court has similarly commented that "exemplary damages are so intimately connected with general damages that if the general allegations are sufficient to show the wrong complained of was inflicted with malice or oppression or other like circumstances, the complaint will be sufficient to authorize the infliction of punitive or exemplary damages."[30]

■ We agree with the approach taken by these authorities. We believe that

---

27. *Martin v. Mears*, 602 P.2d 421, 427 (Alaska 1979).

28. Alaska R. Civ. P. 9(h).

29. *Holloway v. Wachovia Bank & Trust Co., NA*, 339 N.C. 338, 452 S.E.2d 233, 238 (1994).

30. *Stark v. Epler*, 59 Or. 262, 117 P. 276, 278 (1911).

although punitive damages need not be pled in a complaint, the complaint should, at a minimum, allege conduct that meets the legal standard for the award of punitive damages. Alternatively, a sufficiently early notification in the course of pretrial proceedings that punitive damages are being sought could also serve to give fair notice to the opposing party.

Since the advent of tort reform in 1986, punitive damages have been governed by statute. They may be awarded only on proof by clear and convincing evidence that a defendant's conduct was either outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interests of another.[31]

In the present case we have little doubt that fair notice that punitive damages would be sought was not given. The conduct alleged in the counterclaim was not necessarily outrageous or recklessly indifferent, nor was it so characterized. The allegation that Great Divide violated the implied covenant of good faith and fair dealing is not sufficient to support a claim for punitive damages.[32] Further, the body of the complaint seeks only a judgment for the full amount of the liability the Gowdys incurred as a result of Carpenter's injuries, with no claim for personal wrongs to the Gowdys for their treatment by Great Divide. Consistent with the body of the counterclaim, the wherefore clause of the counterclaim simply requested special and general damages, both of which are categories of compensatory rather than punitive damages. No pleadings subsequent to the counterclaim gave notice that punitive damages would be sought. One occasion for the assertion of punitive damages would have been in proposed jury instructions as required by the scheduling order. Carpenter's proposed instructions did not include punitive damages instructions. For these reasons we conclude that appropriate standards relating

to notice of punitive damages claims were not satisfied in this case.

The trial court did not rule on whether punitive damages would be submitted to the jury until after the close of the evidence in the process of deciding on jury instructions. At that point, following Great Divide's renewal of its objection to punitive damages instructions, the court stated:

> Well, I believe that it places Great Divide in a difficult situation. I do believe that we've litigated the issues during the course of the trial. I'll give the instruction. I guess I do that because Mr. Choate moved for a continuance, and Great Divide wanted to go ahead with the trial at the trial date that it was set. And, to some extent, you're in a difficult position because of that decision. And I acknowledge that it wasn't your desire to be in that place where you had to make that decision. I'll give the instruction....

We agree that Great Divide was placed in a difficult situation given the lack of fair notice of the punitive damages claim. It was prejudiced because it had done no legal or factual preparation or discovery related to punitive damages. Great Divide's counsel made a persuasive showing of prejudice. He argued that depositions of supervisors of Great Divide would have been taken inquiring about Great Divide's training methods, claims handling practices, and company policy with respect to the *CHI* decision. He contended that the purpose of these inquiries would be to establish that at worst a mistake was made, as opposed to deliberate or malicious acts deserving of punishment. He noted that the pre-trial phase of the case was over, and with these witnesses being thousands of miles away, "I can't go redo all those depositions...."

But we do not agree with the continuance rationale employed by the trial court. The continuance motion was filed on August 10, the week before trial was to begin. The

**31.** AS 09.17.020(b).

**32.** *State Farm Fire & Cas. Co. v. Nicholson*, 777 P.2d 1152, 1158 (Alaska 1989) (upholding compensatory damages for bad faith conduct while finding insufficient evidence to support award of punitive damages); *State Farm Mut. Auto. Ins.*

*Co. v. Weiford*, 831 P.2d 1264, 1269 (Alaska 1992) (concluding there was sufficient evidence to support a jury finding of bad faith on which a compensatory damage award was based but not a finding of outrageousness supporting punitive damages).

motion did not mention punitive damages. It was based on two reasons. The first was so that the deposition of Anson could be taken, and the second was so that additional motion practice could take place in order to decide unresolved questions of law. The Anson deposition was taken without the need for a continuance. The time for motions on questions of law had expired on June 15, 1999. Further, the objective underlying this reason was to narrow issues, rather than broaden them. Thus it is hard to see how it could later be related to punitive damages.

Carpenter argues though that "the punitive damages claim arose primarily as a result" of the deposition testimony of Anson. Carpenter does not further explain this rationale, and we do not find it to be persuasive. What Anson did and did not do was evident from Great Divide's claims file that had been furnished to Carpenter much earlier in the case. Carpenter's expert, Partlow, concluded before Anson's deposition was taken that Great Divide's conduct was not merely a mistake but rather a willful attempt to avoid its obligations.[33] Further, much of the focus of Carpenter's claim for punitive damages was on the conduct of McKay, and Anson's deposition contributed no significant new knowledge about McKay's conduct.

In summary, we conclude that Great Divide did not have fair notice that punitive damages were being sought, that it was prejudiced when the court instructed on punitive damages, and that the court abused its discretion when it so instructed the jury.

### D. Great Divide Was Not Automatically Bound by the Judgment in *Carpenter v. Gowdy.*

On cross-appeal, Carpenter argues that the trial court erred in failing to rule that the amount of the judgment in *Carpen-ter v. Gowdy* was binding on Great Divide. Carpenter sought such a ruling after the jury was selected but before evidence was presented. Great Divide contended that not only was the judgment not binding but should be inadmissible. As a back-up position, Great Divide contended that if the judgment was admitted in evidence then the details of Carpenter's injury should not be included.

The court declined to rule that the judgment was binding, allowed the fact of the judgment to go to the jury, but ruled that the details of Carpenter's injuries and his course of recovery would not be admitted. During oral argument leading up to this ruling, Great Divide's counsel stated that if Carpenter's counsel believed that the *Carpenter v. Gowdy* judgment "is binding on this court, it could be argued and be in a jury instruction." But no jury instruction concerning the effect of the judgment was given, nor was one requested.

Carpenter's argument that Great Divide is bound as a matter of law by the judgment entered in *Carpenter v. Gowdy* is in conflict with our case law. We have held that covenant settlement agreements can only be binding on an insurance company that does not consent to them if they are found to be reasonable.[34] In *Ramsey* and in *Grace* we indicated that a number of factors are relevant to the question of reasonableness:

> The releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults [sic]; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion or fraud; the extent of the releasing person's investigation and preparation of the case; and the interest of the parties not being released.[35]

**33.** This testimony was the centerpiece of Carpenter's counsel's closing argument to the jury that Great Divide's conduct warranted punitive damages.

**34.** *Grace v. Ins. Co. of N. America,* 944 P.2d 460, 467–68 (Alaska 1997); *Washington Ins. Guar. Ass'n v. Ramsey,* 922 P.2d 237, 247 (Alaska 1996); *Continental Ins. Co. v. Bayless & Roberts,* 608 P.2d 281, 293 n. 20 (Alaska 1980).

**35.** *Ramsey,* 922 P.2d at 247–48. These factors are taken from *Glover v. Tacoma Gen. Hosp.,* 98 Wash.2d 708, 658 P.2d 1230, 1236 (1983), *overruled on other grounds by Crown Controls, Inc. v. Smiley,* 110 Wash.2d 695, 756 P.2d 717, 719 (1988).

*Grace* makes it clear that these factors should be considered by the jury in a jury-tried case.[36]

Although the settlement agreement in the present case was combined with an arbitration proceeding that at least superficially resembled a contested trial, the fact that the judgment in *Carpenter v. Gowdy* was entered by arbitration rather than by agreement does not eliminate the applicability of the requirement that covenant settlement agreements must be found to be reasonable before they may be given effect. The arbitration proceeding was not truly adversarial since Carpenter had already agreed not to execute against the Gowdys at the time that the proceeding took place. Further, the arbitrator was chosen solely by Carpenter's counsel, and the parties agreed to exclude considerations of comparative fault. These factors prevent the *Carpenter v. Gowdy* judgment from being accorded unquestioned acceptance.[37]

Carpenter's argument that the court erred in refusing to hold that Great Divide was bound by the underlying judgment must be rejected for the above reasons. Carpenter does not claim that the court erred in failing to submit to the jury the question whether the settlement and resulting judgment were reasonable, or that the court erred in refusing to permit detailed evidence of Carpenter's injury and course of recovery. If these points had been raised and argued, they might have merit and could warrant setting aside the judgment for compensatory damages and remanding for a new trial on the issue of the reasonableness of the settlement.[38] But as these points have not been raised and this remedy is not sought, the award of compensatory damages must stand.

## III. CONCLUSION

For the above reasons the judgment is AFFIRMED as to compensatory damages and REVERSED as to punitive damages. This case is REMANDED for modification of the judgment consistent with the views expressed herein.[39]

MATTHEWS, Justice, concurring.

I concur fully in the reasoning and the result of the per curiam opinion. I write separately merely to express my view on an issue that the opinion does not reach: whether the evidence was sufficient to warrant submission of the issue of punitive damages to the jury. For the reasons set forth below, I conclude that it was not.

In *State Farm Mutual Automobile Insurance Co. v. Weiford*[1] we summarized our approach in reviewing punitive damage awards:

Punitive damages have a two-fold purpose: "to punish the wrongdoer and to deter the wrongdoer and others like him from repeating the offensive act." *Providence Washington Ins. Co. of Alaska v. City of Valdez,* 684 P.2d 861, 863 (Alaska 1984). Since these objectives go beyond the primary purpose of tort law, to provide just compensation for the wrong done, "punitive damages are not favored in law. They are to be allowed only with caution and within narrow limits." *Alaska Placer Co. v. Lee,* 553 P.2d 54, 61 (Alaska 1976). Consistent with this approach, we have limited punitive damages to cases where the wrongdoer's conduct could fairly be categorized as "outrageous, such as acts done with malice or bad motives or reckless indifference to the interests of another." *State Farm Fire & Casualty Co. v. Nicholson,* 777 P.2d 1152, 1158 (Alaska

**36.** 944 P.2d at 467–68.

**37.** According to section 57 of the RESTATEMENT (SECOND) OF JUDGMENTS even where an indemnitee fully litigates a claim the indemnitor is not bound except upon a showing that "the indemnitee defended the action with due diligence and reasonable prudence." RESTATEMENT (SECOND) OF JUDGMENTS § 57(1)(b)(ii) (1982).

**38.** We do not imply that counsel's failure in this regard was a mistake. Giving up the current

award of compensatory damages carries both the possibility of increasing the award and the risk of reducing it if a future jury were to find the settlement to be unreasonable.

**39.** Great Divide has raised a number of other arguments. We have considered each of them and find them to be either without merit or mooted by this decision.

**1.** 831 P.2d 1264, 1266 (Alaska 1992).

1989); *Alyeska Pipeline Serv. Co. v. Beadles*, 731 P.2d 572, 574 (Alaska 1987); *Ross Lab., Div. of Abbott Lab. v. Thies*, 725 P.2d 1076, 1081 (Alaska 1986). Malice may be inferred if the acts exhibit "a callous disregard for the rights of others." *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 774 (Alaska 1982). However, "where there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice," the trial court need not, and indeed should not, submit the issue of punitive damages to the jury. *Id.; Beadles*, 731 P.2d at 574.

Despite the narrow range in which punitive damages may be awarded, the role of the appellate court in reviewing punitive damages awards is limited. We will reverse a punitive damages award "only if we have a firm conviction based on the record as a whole that the trial court erred and we must intervene to prevent a miscarriage of justice." *Alaska [Alaskan] Village, Inc. v. Smalley*, 720 P.2d 945, 948 (Alaska 1986).[2]

Great Divide argues that the evidence of fault in this case simply shows that Great Divide's employee Anson mistakenly sent letters "that wrongly stated the Gowdys' policy limits, and wrongly stated that the Gowdys could obtain independent counsel at their own expense. There was no evidence of malice or reckless indifference, just mistakes."

Carpenter responds with a one-sentence summary of the facts that he contends justify the award: "Systemic ignorance of basic law in conjunction with the taking advantage of the insured to obtain coverage information warranted punishment." I assume that Carpenter means to include within this statement the three main shortcomings identified by his expert witness Partlow:

(1) The failure of Anson to advise Dan Gowdy of his right to select his own defense counsel who would be paid for by Great Divide (*CHI* counsel);

(2) The failure of Great Divide, and McKay, to conduct an investigation designed to establish coverage; and

(3) McKay's conduct that favored Great Divide to the prejudice of Dan Gowdy by asking questions during depositions that were designed to elicit facts showing no coverage and by submitting reports to Great Divide containing information regarding coverage that was unfavorable to Dan Gowdy.

I proceed to discuss each of these three points.

### 1. Failure To Advise of *CHI* Rights

The only clear misconduct in this case was Anson's failure to advise Dan Gowdy of his right to select his own counsel whose fees would be paid by Great Divide. Today's opinion explains that this was not a mere technical violation of Great Divide's defense duties.[3]

But it is one thing to conclude (as we do) that Anson's failure to advise Dan Gowdy of his *CHI* rights was a material breach, and another to conclude (and today's opinion does not so conclude) that the breach was outrageous and deserving of punishment. Anson testified that he was adjusting claims in all fifty states. He stated that as of August 1995 he was aware of the *CHI* decision in Alaska, but he also testified that his understanding was that if insureds "requested an independent counsel of their choosing, then yes, we would provide that for them." While Anson's testimony concerning his understanding of *CHI* was confused and inconsistent with his August 31, 1995 letter, there is little to suggest that his failure to comply with the requirements of *CHI* was other than a negligent mistake. In February 1996 Elmer Gowdy's attorney, Loren Domke, requested that he be allowed to defend Elmer as *CHI* counsel. Great Divide complied with this request, and thereafter at least one partner to the Gowdy & Son partnership was afforded *CHI* rights by Great Divide. Thus, although Anson's mistake concerning *CHI* coverage was a material breach of Great Divide's defense obligations, "there is no evi-

---

2. *Id.* at 1266 (footnote omitted).

3. Op. at 610–611.

dence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice."[4]

## 2. Failure To Seek Out Coverage

### a. Great Divide

There is evidence that would justify finding that after reviewing the complaint Anson concluded that there was no coverage, and thereafter, in the words of the court's instruction, he did not fulfill his "duty to diligently search for evidence which supports" coverage. But this was more a matter of attitude than a failure of conduct. Anson did send a field adjuster to investigate facts relating to both liability and coverage, and his investigation appears to have been reasonably thorough, if not particularly imaginative.

The allegations of the complaint provide the initial guide to whether an insurance company has a duty to defend. The duty to defend arises "if the complaint on its face alleges facts which, standing alone, give rise to a possible finding of liability covered by the policy...."[5] If the complaint does not contain allegations indicating coverage, there is nonetheless a duty to defend "if facts underlying the complaint are within, or potentially within, the policy coverage and are known or reasonably ascertainable by the insurer."[6]

The allegations of Carpenter's initial complaint affirmatively excluded coverage. The complaint alleged that the falling tree that injured Carpenter was cut in the course of Dan Gowdy's tree-felling business. If this had been true, the classification exclusion would have excluded coverage. Even though the allegations of the complaint negated coverage, this did not discharge Great Divide from its duty to take reasonable steps to ascertain whether the facts underlying the complaint were potentially within policy coverage. Complaints may be amended, and in any case the allegation in question was not binding on Dan Gowdy. Nonetheless, the fact that the allegations of the complaint explicitly negate coverage serves to explain Anson's quick judgment and negative mindset on the coverage issue. I believe that his conduct concerning the duty to seek out coverage, at worst, can only reasonably be characterized as negligent.

### b. McKay

McKay conceived of his role in defending Dan Gowdy as limited to providing a defense to the Carpenter complaint. He testified "I was there to do the liability. I wasn't there to do the coverage."

The trial court did not instruct the jury that an attorney appointed by an insurance company to defend an insured must seek out coverage for the insured, although Partlow, a non-lawyer, testified that he thought attorneys had this duty. In *CHI* we discussed the role of counsel appointed by an insurer, noting a split of authority as to whether appointed counsel should report information that might give rise to a policy defense to the insurer. Both sides of this debate seemed to agree that it would be appropriate for appointed counsel "to be involved only in the defense of the liability claim, not in coverage issues," if this is made clear at the outset of the engagement.[7] Although it is unclear whether McKay told Dan Gowdy that he would not be involved in coverage issues, his failure to become involved in coverage issues seems to have been within the expectations of Dan Gowdy and Bradley. I do not believe that it can reasonably be regarded as outrageous.

## 3. McKay's Deposition Questions and Reports to Great Divide

At trial Carpenter claimed that deposition questions asked by McKay were intended to negate coverage. The questions generally sought information that might show that Rick Ostman was neither employed nor being supervised by Dan Gowdy at the time of the accident. McKay explained that if he

---

4. *Weiford*, 831 P.2d at 1266.

5. *Afcan v. Mutual Fire, Marine & Inland Ins. Co.*, 595 P.2d 638, 645 (Alaska 1979).

6. *Fejes v. Alaska Ins. Co.*, 984 P.2d 519, 522 (Alaska 1999).

7. *CHI of Alaska, Inc. v. Employers Reinsurance Corp.*, 844 P.2d 1113, 1116 (Alaska 1993).

could establish those facts Dan Gowdy would be exonerated. The deposition was taken before Elmer Gowdy or Gowdy & Son were added as defendants. Both McKay and Carpenter are right as to the impact of the questions. If it could be established that Ostman was not working for or being supervised by Dan, Dan would have no liability. He would also have no coverage, but that would be irrelevant if he was not liable. I believe that the questions are reasonably viewed as embodying a plausible litigation strategy, and that the evidence is lacking that McKay asked them because of a misplaced loyalty to Great Divide.[8]

McKay also wrote two reports to the insurance company that were cited as examples of improper communication to Great Divide. The court instructed the jury that an attorney who represents an insured cannot supply information detrimental to the insured to the insurance company. As we noted in *CHI* with respect to insurer appointed counsel, there is a split of authority as to the nature of the obligation of appointed counsel to report information that may give rise to a policy defense.[9] But assuming the correctness of the instruction, the duty not to supply detrimental information cannot be met simply by refusing to report at all to the insurance company. The statute that was enacted to flesh out *CHI* obligations, AS 21.89.100, requires that even *CHI* counsel consult with the insurer "on all matters relating to the civil action" and to "disclose to the insurer in a timely manner all information relevant to the civil action, except information that is privileged and relevant to disputed coverage."[10]

The reports that McKay submitted to Great Divide are mainly summaries of non-privileged deposition testimony. Some of the testimony that is reported is relevant to both liability and coverage as described above. But the reports never mention the topic of coverage. They only discuss various strate-

gies concerning the defense of Dan Gowdy in the Carpenter case. In my view the reports are consistent with the reporting requirements expressed in AS 21.89.100 and I do not believe that they can be reasonably read as showing that McKay in writing them was intent on bolstering Great Divide's coverage defense.

In summary, Great Divide did not correctly advise Dan Gowdy of his *CHI* rights and did not investigate coverage with an open-minded attitude. But Great Divide did appoint counsel who provided an acceptable and ultimately successful defense of Dan Gowdy in cooperation with *CHI* counsel for Elmer Gowdy. And Great Divide's early negative attitude toward coverage is understandable, though not excusable, because the allegations of Carpenter's complaint themselves negated coverage. Under these circumstances while Great Divide's failures may have been material breaches of its defense duties, they cannot reasonably be characterized as outrageous. I thus have a definite and firm conviction "based on the record as a whole that the trial court erred and we must intervene to prevent a miscarriage of justice."[11] On this ground as well as on lack of fair notice grounds, I conclude that the award of punitive damages must be vacated.

EASTAUGH, Justice, dissenting.

## A. Introduction

I disagree with this court's conclusion that the insurance policy covered Raymond Carpenter's claims. I therefore respectfully dissent. The activity that injured Raymond Carpenter, cutting down a tree, was not one of the two classified operations—floor covering and sheet-metal work—covered by the policy. Nor is it reasonable to view this activity as an "incidental support activity" to the operations the policy actually did cover. Finally, I think it important not to confuse the operation that harmed Carpenter—cut-

---

8. McKay clearly was not seeking to protect Great Divide when he recommended to Dan Gowdy that he accept the covenant settlement agreement. His role at that point was correctly described by Great Divide's expert Geraghty as protective of Gowdy "to the prejudice of the insurance company."

9. 844 P.2d at 1116.

10. AS 21.89.100(e).

11. *Alaskan Village, Inc. v. Smalley,* 720 P.2d 945, 948 (Alaska 1986).

ting down trees—with its purpose—gathering fuel.

## B. Facts

Great Divide's insurance policy provided commercial general liability coverage to the Gowdys' business, a partnership doing business as Gowdy & Son. It covered liability for bodily injury "to which this insurance applies." This coverage was subject to this exclusion for bodily injury claims arising from non-classified business operations:

### EXCLUSION—CLASSIFICATION LIMITATION

The following exclusion is added to COVERAGES A, B and C (Section I): This insurance does not apply to "bodily injury," . . . for operations which are not classified or shown on the Commercial General Liability Coverage Declarations, its endorsements or supplements.

The policy's declarations pages described the Gowdys' business as "Floor Covering Installation" and specified premiums for the two categories of work listed under the policy's "Classification" declaration. The two listed classifications were "Floor Covering Installation—not ceramic, tile or stone" and "Sheet Metal Work—outside." Each of these two classifications specified code numbers, the bases for calculating the premium, the applicable premium rate, and the total premium. The premium charged for each classification was dependent on various bases, including payroll. These were the only premiums paid by the Gowdys for this policy.

The policy did not list tree-felling as a classified operation.

On September 3, 1993, Rick Ostman cut down the tree that struck Raymond Carpenter; it was to be used for firewood to help heat Elmer Gowdy's home, where Elmer performed administrative tasks for the partnership. Elmer also stored business equipment in the attached garage.

Findings of the superior court and the advisory jury establish that Ostman was working for Gowdy & Son at the time of the accident and that the accident occurred "during the course and scope" of the Gowdys' business. In denying Great Divide's motion for a directed verdict on coverage, the superior court commented that, although "the connection to the business itself was not strong," gathering firewood to heat the business premises was sufficiently business-related that it "was not prohibited under the policy." [1] The superior court, in finding coverage, referred to opinions of Carpenter's insurance expert to the effect that the classified operations exclusion did not exclude coverage for business activities that are "necessarily ancillary" to the main business activities.

## C. The Policy Did Not Cover Carpenter's Claims.

Great Divide argues that, as a matter of law, the policy excludes claims arising from this accident, even if Ostman was working for the business when he cut down the tree. It contends that the accident did not occur during a classified operation, and that the policy consequently does not cover Carpenter's injuries.

Carpenter responds that the superior court's findings of fact and the advisory jury's special verdict support the superior court's conclusion. But as Great Divide points out, it is not determinative that Ostman was working for Gowdy & Son when he cut the tree down: that the tree was felled in the course of Gowdy & Son's business is a necessary but not sufficient condition for coverage.

Carpenter also argues that the firewood-gathering job was "reasonably incidental" to the Gowdys' classified operations and should therefore be covered by the policy, even though the policy does not explicitly cover incidental operations. This court accepts

---

1. The advisory jury answered "yes" to this special verdict question: "Did the accident resulting in injury to Raymond Carpenter occur during the course and scope of business of Elmer and Dan Gowdy d/b/a Gowdy and Son?"

Although the issue was hotly contested at trial, Great Divide does not appeal the superior court's finding that Ostman was working for Gowdy & Son when he cut down the tree.

that argument.[2] It affirms because it concludes that the tree-cutting activity that injured Raymond Carpenter "can reasonably be viewed as an incidental support activity" to a business that heats its premises by wood.[3] It reasons that this activity differed from a "revenue-earning activity" that would have been an "operation" subject to the classification limitation exclusion in the policy.[4] I disagree with these conclusions.

The question of coverage under the Great Divide policy presents a question of contract interpretation and does not turn on disputed fact issues.[5]

Great Divide supports its interpretation of the classification limitation by noting that the Gowdys' premium was computed solely with reference to the two classified operations. This circumstance, in itself, would not preclude coverage. Courts have rejected attempts to deny coverage on the sole ground that the injury occurred outside listed classifications used for premium-setting purposes.[6] Rather, courts have stated that an insurer wishing to limit coverage to classified activities should include an express exclusion to this effect.[7]

Great Divide included such an express exclusion in the Gowdy & Son policy. That exclusion provides: "This insurance does not apply to 'bodily injury' ... for operations which are not classified or shown on the ... Coverage Declarations." The question is therefore whether this express exclusion is sufficient. I think that it is. The language is plain enough on its face. Nothing implies that tree-felling, even if it is conducted for business as opposed to private purposes, is an operation that is within either of the two operations classified in the policy's coverage declarations.

My reading of the exclusion is confirmed by two cases applying New York law and upholding similar exclusions in commercial liability policies like Great Divide's. In *Mount Vernon Fire Insurance Co. v. Chios Construction Corp.*, a United States district court applied New York law to a policy structured exactly like the Gowdy & Son policy: a declarations page listed classified operations and a classification limitation endorsement excluded coverage for claims arising from anything else.[8] The only classified operation was "Carpentry—Interior."[9] The claimant

---

2. Op. at 606.

3. Op. at 606–607.

4. *Id.*

5. We review findings of fact under the clearly erroneous standard. *Alaska Foods, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 482 P.2d 842, 848 (Alaska 1971). We use our independent judgment to determine the legal significance of those facts. *Alaska Travel Specialists, Inc. v. First Nat'l Bank of Anchorage*, 919 P.2d 759, 762 (Alaska 1996). "The construction of an insurance contract is a matter for the court, unless its interpretation is dependent upon the resolution of controverted facts." *State v. State Farm Fire & Cas. Co.*, 939 P.2d 788, 790 (Alaska 1997). Even when facts are disputed, we review the words of any contract de novo. *Tsakres v. Owens*, 561 P.2d 1218, 1222 (Alaska 1977). We treat insurance contracts as contracts of adhesion, resolving ambiguities against the insurer. *Makarka v. Great Am. Ins. Co.*, 14 P.3d 964, 966 (Alaska 2000). We construe insurance contracts to provide coverage that a layperson would have reasonably expected. *Id.* To determine reasonable coverage expectations, we look to the language of the disputed provision, the language of the other provisions of the policy, relevant extrinsic evidence, and case law interpreting similar provi-

sions. *Hale v. Fireman's Fund Ins. Co.*, 731 P.2d 577, 580 (Alaska 1987).

6. *See, e.g., Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 239 (2d Cir.2002) (holding that insurer cannot rely upon classification scheme to deny coverage because policy fails to provide that classifications define covered risks); *Feurzeig v. Ins. Co. of the West*, 59 Cal. App.4th 1276, 69 Cal.Rptr.2d 629, 634 n. 5 (1997) (collecting cases and holding that rating classification could not be construed as additional limitation on coverage absent express language indicating that such construction was intended by parties).

7. *E.g., Mount Vernon Fire Ins. Co.*, 277 F.3d at 239 (noting that "[i]f [insurer] wished to limit the coverage based on classifications, it should have done so specifically"); *Thompson v. Harold Thompson Trucking*, 12 Kan.App.2d 449, 748 P.2d 430, 435 (1987) (collecting cases and stating that "an insurance company wishing to limit the scope of coverage to that classification of operations listed in the declarations can do so by express exclusion") (citations omitted).

8. 1996 WL 15668, *1 (S.D.N.Y. Jan.17, 1996).

9. *Id.*

sought coverage for injuries sustained while cleaning steel beams.[10] Relying on the classification limitation, the court held that the insurance company had no duty to defend—much less indemnify—its insured, reasoning that "there is not even a metaphysical possibility that the . . . injury is covered."[11]

The Appellate Division of the Supreme Court of New York relied upon a similar classification limitation in *Ruiz v. State Wide Insulation & Construction Corp.*[12] The classified operation in *Ruiz* was "painting."[13] Plaintiffs alleged personal injuries and property damage stemming from a fire that started while the third-party defendant was repairing their roof.[14] Relying on the classification limitation, the appellate court reversed the trial court's denial of the insurer's motion for summary judgment, reasoning that "[t]he terms of the policy are clear and unambiguous and their construction may be determined as a matter of law."[15]

The parties have not directed us to any other cases interpreting similar language, and I am not aware of any. I find these cases persuasive.

Contrary to what this court thinks, it does not matter whether Gowdy & Son was to be paid for cutting down this tree.[16] Whether the tree-felling activity was a separate source of revenue for the business is inconsistent with this court's justification for finding coverage; it is also irrelevant. It is inconsistent because the court's decision turns on its conclusion that Ostman's activity supported the floor-covering operation.[17] That conclusion necessarily assumes that there was a business nexus, and thus that heating the business premises (and therefore by extension gathering fuel, and, by further extension, cutting the tree) advanced the business's

profit-making purposes. If the applicability of the exclusion did turn on a business purpose, i.e., profit-making, it would have been satisfied by the court's inherent assumption that Ostman's activity advanced the floor-covering business. (The fact that the tree-felling activity was not revenue-generating nonetheless helps illustrate why this activity was so remote from any covered operations.)

And whether the business was to be paid for cutting the tree is also irrelevant to the words of the policy. No words in the exclusion imply that it turns on whether the unclassified activity is revenue-generating. It is hard to imagine all the "incidental" non-income generating business operations that might be covered on this theory. Cutting trees for use as fuel sometime in the future would seem no different than demolishing the old business premises, excavating for and building new premises, driving a well to serve the business, or installing electrical power and gas lines. Some or all of these activities would seem to be unclassified operations. Just because these activities might not generate revenue should not determine whether they are unclassified operations.

In my view, timber felling, even for purposes of heating the business premises, is in the category of "operations which are not classified or shown" on the insuring declarations.

The next question is whether, as Carpenter argues, gathering firewood was "reasonably incidental" to the insureds' classified operations and is therefore covered even though the policy does not explicitly cover incidental operations. This court concludes that the tree-cutting activity that injured Raymond Carpenter "can reasonably be viewed as an incidental support activity" to a

---

10. *Id.* at *2.

11. *Id.* at ⁺3. The court noted the "heavy burden" borne by an insurer seeking to avoid its obligation to defend, concluding that the insurer met that burden by showing that the policy exclusion was "stated in clear and unmistakable language, . . . subject to no other reasonable interpretation, and applie[d] in the particular case." *Id.* at *1, *3 (citation omitted).

12. 269 A.D.2d 518, 703 N.Y.S.2d 257, 258 (N.Y.App.Div.2000).

13. *Id.*

14. *Id.*

15. *Id.* at 259.

16. *Cf.* Op. at 606–607.

17. Op. at 606.

business that heats its premises by wood.[18] It reasons that this activity differed from a "revenue-earning activity" that would have been an "operation" subject to the classification limitation exclusion in the policy.[19]

The first problem with this interpretation of the insurance contract is that the words of the contract do not support it. Likewise, this interpretation is hard to square with the results in *Mount Vernon Fire Insurance Co.*[20] and *Ruiz*,[21] discussed above. One would expect those cases to have ended differently if there were any legitimate basis for thinking such a policy covers incidental activities.

A second problem is that any incidental activity coverage must be somehow anchored in the policy language. I assume that some liability policies in Alaska can properly be read to provide some undefined coverage for some "incidental" activities. But any such "incidental activity" coverage must be consistent with the words of the policy. The only pertinent Alaska cases brought to our attention involved policies that did not contain an exclusion equivalent to the classification limitation exclusion in the Great Divide policy. In a case in which policy language did not explicitly provide for such coverage or attempt to exclude it, this court held that incidental activities were covered. Thus, we held in *Hale v. Fireman's Fund Insurance Co.* that a produce-stand owner's "premises-operations" policy provided coverage for "necessary and incidental" operations.[22] *Hale* is distinguishable because the policy did not contain an exclusion like the one that controls here. Moreover, there we relied on extrinsic evidence in finding coverage: the policy in *Hale* had replaced an earlier policy which explicitly provided coverage for "necessary or incidental" operations.[23] I am not

aware of any extrinsic evidence here that permits an inference that the Gowdys thought they were purchasing specific coverage for tree-felling operations or general coverage for activities "incidental" to the two classified operations. There is instead evidence that Dan Gowdy had good reason to think he would not be covered for tree-felling, and indeed thought after the accident that the policy did not cover Carpenter's claims.

This court has approvingly cited a federal district court decision which, applying Minnesota law, reasoned that parties to an insurance contract language containing a "loading-unloading" clause "most likely intended to cover ... all hazards from the initial loading until the goods were unloaded *including all incidental and necessary parts* of the unloading process."[24] Again, there was no exclusion like the one at issue here. Furthermore, there the incidental activity was at least closely related in time and place to the unloading process. Nonetheless, the Eighth Circuit reversed on the ground the unloading process had been completed before the accident occurred.[25] There is no such close connection here between the two classified operations and the activity that harmed Raymond Carpenter.

A third problem is that the court's conclusion that it is "reasonable" to find incidental activity coverage here seems at odds with the usual approach in interpreting an insurance policy. The court's conclusion seems to ignore the absence of policy language or extrinsic evidence implying coverage. But assuming we can look to post-formation circumstances, I am not willing to say as a matter of law that it is "reasonable" to find coverage for this activity. Cutting down trees in early September for future use in

18. Op. at 606–607.

19. *Id.*

20. 1996 WL 15668 at *3.

21. 703 N.Y.S.2d at 259.

22. 731 P.2d 577, 580 (Alaska 1987).

23. *Id.* at 580.

24. *See Marwell Constr., Inc. v. Underwriters at Lloyd's, London,* 465 P.2d 298, 304 (Alaska 1970), quoting from the district court's decision, *Johnson, Drake & Piper v. Liberty Mut. Ins. Co.,* 258 F.Supp. 603, 610 (D.Minn.1966), *rev'd,* 390 F.2d 410, 413 (8th Cir.1968). The ground for the Eighth Circuit's reversal, that the unloading process had been completed before the accident, is irrelevant to the case before us.

25. *Johnson, Drake & Piper,* 390 F.2d at 413.

heating a home also used for administrative purposes seems too remote in purpose, time, and place to be "incidental" to Gowdy & Son's classified business operations.[26] The activity was not conducted to fulfill any particular contract; it did not occur at the business premises or at a job site; it did not occur on a day when job work was being performed; and it seems to have taken place well in advance of the time the wood would be needed.

Carpenter's position might be more plausible had Ostman cut down the tree to obtain wood to be used for flooring for a specific floor-covering job. But virtually every business-related activity could be deemed "incidental" to the covered operations under the expansive view of the policy the court takes here. Accepting Carpenter's position vitiates the policy's classification scheme and transforms a limited policy into a comprehensive one. Conducting business activities at Elmer Gowdy's home is justifiably regarded as "incidental" to the classified operations. Perhaps the step-removed activity of stoking the wood stove is also. And perhaps stock-piling fuel on the premises should be also, although it is another step removed. But going onto someone else's land and cutting down trees for future use as fuel is far too attenuated to be "reasonably" held to be "incidental."

Inherent in the court's opinion is a conclusion that cutting down the tree was close enough to the revenue-generating activity of floor-covering to be incidental or supportive, and thus covered, but not so close that it can be deemed to be revenue-generating, and thus not covered. Both aspects of this conclusion are alien to the actual policy language. The policy said nothing about covering incidental or supporting activities, and the exclusion did not depend on whether a particular operation did (or would) generate revenue.

Finally, Ostman's activity was the sort that was subject to a separate classification, for a substantial additional premium.[27] There are marked differences between the accident activity and the classified activity of floor-covering. Tree-felling poses altogether different personal injury hazards; the causes, frequency, and consequences of accidents differ greatly. Tree-felling requires different skills that are exclusive to that profession; it requires specialized training and equipment, and greater physical strength. Tree-felling is a separate profession. The activities are not related; they are not commonly performed by the same business. Ostman was cutting down trees. He was not simply using his hands to pick up wood that was already downed. Surely the policy would not have covered mechanized extraction of other fuels, such as coal or oil, to be used for heat. Common sense distinguishes this activity from activities that might be genuinely incidental.

Assuming that some activities which merely support the two classified activities are nonetheless within coverage, cutting down trees cannot be considered within the penumbra of either classification.

The court may assume that the coverage of such a policy is inherently broad. Certainly the result reached here has the effect of broadly providing coverage the policy does not expressly provide. A commercial general liability policy "affords specific coverage for specific losses."[28] That the "incidental" coverage found here is not reasonable is confirmed by the annual premium. It was less than $2,000, little more than what many motorists pay for routine automobile coverage, even though this policy had facial liability limits of $1,000,000. Based on his own expe-

**26.** Rick Ostman testified that Elmer Gowdy performed administrative tasks for the business at his home. Ostman also testified that Elmer stored floor covering equipment and materials in the garage, but that none of the wood-burning stoves used to burn firewood were located in the garage. But even if the garage were heated by wood-burning stoves, and assuming that equipment storage is sufficiently connected to the classified operations to be deemed "reasonably incidental" thereto, the firewood-gathering oper-

ation—which is itself at most incidental to an activity that is already incidental to the classified operation—would still be too attenuated.

**27.** Dan Gowdy testified that he previously had a timber liability policy for a firewood operation that he used to run. He testified that the policy's insurance premiums were "exorbitant."

**28.** *Friar v. Statutory Trs. of Kirkwood Sports Ass'n, Inc.,* 959 S.W.2d 808, 811 (Mo.App.1997).

rience with the cost of a timber policy, Dan Gowdy did not think the policy covered this accident.

## D. Conclusion

Having concluded that the insurance policy did not cover Raymond Carpenter's claims, I would reverse and remand for entry of judgment for Great Divide.[29]

**29.** Given my conclusion that the policy does not cover these claims, it is necessary to reach Carpenter's alternative argument that Great Divide's conduct estops it from denying coverage. I would hold as to that issue that Great Divide's conduct does not estop it from denying coverage.

*See Lloyd's & Inst. of London Underwriting Cos. v. Fulton,* 2 P.3d 1199, 1212–15 (Alaska 2000) (Eastaugh, J., dissenting). Because I conclude that there was no coverage, it is not necessary for me to reach the other issues addressed in the court's opinion.